United States Court of Appeals,

Fifth Circuit.

No. 95-31233.

In the Matter of T-H NEW ORLEANS LIMITED PARTNERSHIP, Debtor.

FINANCIAL SECURITY ASSURANCE INC., Appellant-Cross-Appellee,

v.

T-H NEW ORLEANS LIMITED PARTNERSHIP, Appellee-Cross-Appellant.

July 9, 1997.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before WISDOM, SMITH and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

This Court visits this case for a second time.[1] The Appellant, Financial Security Assurance, Inc. ("FSA"), appeals the bankruptcy court's ruling that it was not entitled to postpetition preconfirmation interest from the petition date notwithstanding FSA's overcollateralization at confirmation; the value assigned to the collateral; the appropriate confirmation interest rate; and confirmation of the bankrupt's Chapter 11 plan. On appeal, FSA asserts a myriad of errors by the bankruptcy court. T-H New Orleans Limited Partnership ("T-H NOLP") asserts two cross-issues. Finding no reversible error, we affirm.

*FACTS AND PROCEDURAL HISTORY*

In June of 1988, T-H NOLP acquired a Days Inn Hotel (the

_____

[1]This Court has already heard a previous appeal between the two parties to this appeal. *See In re T-H New Orleans Ltd. Partnership,* 10 F.3d 1099 (5th Cir.1993) ("T-H NOLP I").

1

"Hotel") in New Orleans, Louisiana and has operated the Hotel continuously since that date. T-H NOLP is a limited partnership with a corporate general partner, Tollman-Hundley New Orleans Corp., and five individual limited partners. The day-to-day management and operations of the Hotel property are carried out by the individuals employed by T-H NOLP. T-H NOLP is also a member of the Tollman-Hundley Hotels group of companies.

In February 1989, T-H NOLP sought to restructure the under-lying mortgage debt on the Hotel through a mortgage bond financing transaction involving T-H NOLP and six other hotels owned by separate Tollman-Hundley partnerships. As part of the refinancing, T-H NOLP and the six other hotel partnerships, all controlled by Monty Hundley and Stanley Tollman, obtained separate but cross-collateralized and cross-guaranteed first mortgage loans, which were secured by the Hotel and other hotels as well as the revenues generated therefrom, in the amount of $87,000,000 from a newly created business trust (the "Issuer"). T-H NOLP executed various agreements including a Mortgage Note and Loan Agreement, and a Collateral Mortgage Note.

To raise the necessary money to make the mortgage loans to T-H NOLP and the other hotels, the Issuer issued $87,000,000 in bonds, the payment of which was guaranteed by a surety bond issued by FSA. In return, the Issuer of the bonds assigned to FSA all its rights and interest in the security agreements, and authorized FSA to be its attorney-in-fact in order to take whatever actions FSA deemed necessary to exercise its rights under the mortgage loans and

related collateral.

By 1990, T-H NOLP and the six other partnerships were in default on the loans, and FSA stepped into the shoes of the bond Issuer. After the parties were unable to reach a settlement, FSA accelerated the mortgage note and demanded payment of all amounts due under the loan agreement and guarantee. On February 25, 1991, T-H NOLP filed for bankruptcy under Chapter 11 of the Bankruptcy Code; the other six hotel partnerships also filed for bankruptcy. At the time T-H NOLP filed bankruptcy, FSA's allowed claim was $18.424 million.

Subsequent to the bankruptcy filing, FSA filed a motion for adequate protection or segregation of hotel receipts. The bankruptcy court granted FSA's motion, finding that it had a security interest in the Hotel's prepetition and postpetition revenues from its operations, and ordered that the Hotel's business revenues be segregated. The bankruptcy court also entered a cash collateral order (dated May 1, 1992) which provided that T-H NOLP make payments from the Hotel's net revenues in order to reduce its obligation to FSA.

On appeal, this Court in *In re T-H New Orleans Limited Partnership,* 10 F.3d 1099 (5th Cir.1993) ("T-H NOLP I") held that T-H NOLP's postpetition Hotel revenues were "rents" under Louisiana law and, therefore, were subject to FSA's prepetition security agreement under § 552(b) of the Bankruptcy Code and must be segregated. The Court remanded the case with instructions for further proceedings consistent with its opinion.

3

On February 24, 1994 T-H NOLP filed its amended disclosure statement and amended plan of reorganization.  The bankruptcy court approved the amended disclosure statement in June 1994.  On July 15, 1994, FSA filed an objection to plan confirmation, and T-H NOLP filed an objection to FSA's claim.

The bankruptcy court, early in the case, found that the appraised value of the Hotel was $12.2 million;  this valuation was based upon an appraisal report as of July 1, 1991 which was commissioned by FSA. FSA's motion for adequate protection was based upon this appraised value.  Subsequently, the bankruptcy court held a hearing to determine the fair value of the Hotel and found, after considering the evidence presented by T-H NOLP and FSA, that, as of July 14, 1994, the fair value of the Hotel was $13.7 million.[2] Accordingly, the bankruptcy court found that the value of FSA's security interest in the Hotel was $13.7 million.  The bankruptcy court also found that based on the uncontroverted testimony, the fair value of the Hotel would increase over the two year period following confirmation of T-H NOLP's proposed amended plan.

The bankruptcy court also held a hearing on FSA's allowed claim.  FSA stipulated for purposes of the confirmation hearing that its allowed claim as of the petition date was $18,424,000.  T-

---

[2]FSA provided an appraisal valuing the Hotel at a greater value.  However, that appraisal did not include adjustments for a yearly corporate overhead allocation which the bankruptcy court found, based on the evidence presented, to be a necessary expense and should be accounted for in determining the fair value of the Hotel.  FSA's appraiser testified that if the corporate overhead allocation charge was considered, his opinion as to the appraised value of the Hotel would decrease by the amount of the allocation and the Hotel's fair value would be $13.7 million.

H NOLP presented evidence showing that it had made postpetition cash collateral payments of $4,675,945 through the end of September, 1994.[3] Thus, the bankruptcy court, after accounting for the postpetition rent payments (pursuant to the May 1, 1992 cash collateral order) on FSA's claim and not including any potential entitlement to postpetition preconfirmation interest, found that FSA's claim amounted to $13,748,055 as of September 30, 1994.[4]

The bankruptcy court therefore found that because FSA's claim of $13,748,055 was greater than the fair value of the Hotel ($13.7 million), thus making FSA's claim undersecured, FSA was not entitled to postpetition, preconfirmation interest on its claim under § 506(b) of the Bankruptcy Code until the time when the value of its collateral exceeded the amount of its claim. At that point, FSA would be entitled to interest at the contract rate on its claim to the extent that the value of the collateral exceeds its allowed claim, i.e. the equity cushion, and that any postpetition interest was limited to the equity cushion created by the monthly accrual of

---

[3]A representative of FSA testified that FSA had received cash collateral from T-H NOLP in the amount of $4,770,666 as of September 23, 1994; however, FSA's representative failed to present any supporting evidence to support FSA's position.

[4]The bankruptcy court applied the cash collateral payments against the unsecured portion of FSA's claim, following the bankruptcy court in *In re 354 East 66th Street Realty Corp.,* 177 B.R. 776 (Bankr.E.D.N.Y.1995). In reaching its decision, the bankruptcy court analyzed the two line of cases that have addressed this issue, i.e., the addition cases and the subtraction cases. *See, e.g. In re Union Meeting Partners,* 178 B.R. 664 (Bankr.E.D.Pa.1995). However, we do not answer today the question of whether the bankruptcy court's reduction of the unsecured portion of FSA's claim was proper, as that issue was not raised on appeal.

net rents generated by the Hotel.

Finally, with respect to T-H NOLP's amended plan of reorganization (the "Plan"), FSA was the only creditor to object to confirmation of the Plan and to vote to reject the amended Plan.[5] FSA argued against Plan confirmation on several grounds which are addressed in each of its issues on appeal.  All other classes of creditors either voted affirmatively to accept the amended Plan or were deemed to have accepted the amended Plan. Thus, T-H NOLP sought confirmation of its amended Plan under the "cramdown" provisions of Chapter 11 of the Bankruptcy Code.  Following three days of confirmation hearings, the bankruptcy court on March 27, 1995, entered an order denying Plan confirmation.[6]

On March 30, 1995, the bankruptcy court entered an order confirming T-H NOLP's amended Plan under the cramdown provisions of Chapter 11.  The bankruptcy court also determined that the proper postconfirmation interest rate was 11.5 percent.  On June 27, 1995,

---

[5]FSA's claim was a Class 4 claim in the amended plan which was to be treated as follows:  (a) reduction of FSA's claim from the prepetition amount of $18.242 million by application of postpetition, preconfirmation payments made to FSA under the bankruptcy court's May 1, 1992 cash collateral order;  (b) payment of the remaining amount of the FSA claim through twenty-four monthly payments of principal and post-confirmation interest, based on a twenty-year principal amortization at 8% interest or such other cramdown rate approved by the bankruptcy court, with a balloon payment of all remaining principal and interest at the end of two years;  and (c) payment of the remaining balance, after application of all prior payments, in one of three ways (1) refinancing with another lender;  (2) sale of the Hotel;  or (3) a *dation en paiement* transferring ownership of the Hotel.

[6]The bankruptcy court denied plan confirmation based on language in Section X.2 of the plan which it considered overly broad and ambiguous.  T-H NOLP agreed to delete this language.

the bankruptcy court denied FSA's motion for reconsideration or new trial.

Both FSA and T-H NOLP appealed to the district court for a review of the bankruptcy court's decisions. The district court affirmed. This appeal ensued. We now address FSA's and T-H NOLP's arguments raised before this Court.

*DISCUSSION*

This Court, acting as a second review court, reviews the bankruptcy court's findings of fact under the clearly erroneous standard, and the bankruptcy court's conclusions of law *de novo.* *In re United States Abatement Corp.,* 79 F.3d 393, 397 (5th Cir.1996). We also note that while FSA listed in its brief fourteen issues on appeal, FSA only discusses six of them in the corpus of its brief. Federal Rule of Appellate Procedure 28(a)(6) provides that "[t]he argument must contain the contentions of the appellant on the issues presented, and the reasons therefor...." Pursuant to Rule 28, this Court has found "that contentions not briefed are waived and will not be considered on appeal." *Trust Co. of Louisiana v. N.N.P., Inc.,* 104 F.3d 1478, 1485 (5th Cir.1997) (citing *Zeno v. Great Atlantic & Pacific Tea Co.,* 803 F.2d 178 (5th Cir.1986)). Thus, the only issues that this Court will consider on appeal are those that were actually briefed by the parties in accordance with Rule 28.

*1. FSA's Entitlement to Postpetition Interest*

FSA asserts that the value of the Hotel was increasing during the bankruptcy proceedings, and that its claim was decreasing due

7

to the monthly cash collateral payments. Thus, at some point between September 1994 and the March 30, 1995 confirmation order the value of the property became greater than its claim. There-fore, FSA argues that since the collateral's value exceeded its claim on the day the Chapter 11 plan was confirmed or became effective, it was entitled to postpetition interest under § 506(b) to the extent of its contract rate for the entire postpetition period. FSA also argues that it should have been paid the postpetition interest monthly instead of at confirmation. In response, T-H NOLP relies on the bankruptcy court's conclusion, and objects to the allowance of any postpetition preconfirmation interest on FSA's claim until that point in time when the Hotel's value was greater than FSA's claim. T-H NOLP also asserts on cross-appeal that the bankruptcy court erred by requiring it to make postpetition preconfirmation interest payments while FSA appealed the bankruptcy court's order confirming T-H NOLP's Plan.

The parties' arguments raise the following questions for our consideration. First, where a secured creditor is receiving cash collateral payments which reduce the creditor's allowed claim such that at some point in time prior to plan confirmation the creditor may become oversecured, is that creditor entitled to accrue interest under § 506(b)? Second, when, under § 506(b), does interest begin to accrue, and the extent to which a creditor is entitled to postpetition interest?

There is no question that a creditor's entitlement to postpetition interest on its claim is determined under § 506(b) of

8

the Bankruptcy Code. Section 506(b) states in relevant part that "[t]o the extent that an allowed secured claim is secured by property, the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim interest on such claim...." 11 U.S.C. § 506(b). The United States Supreme Court in *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) made clear that under § 506(b) a creditor is unqualifiedly entitled to postpetition interest on its oversecured claim. *Id.* at 241, 109 S.Ct. at 1030; *see In re Pointer,* 952 F.2d 82 (5th Cir.1992); *In re Sublett,* 895 F.2d 1381 (11th Cir.1990). However, § 506(b) applies only from the date of filing through the confirmation date. *Rake v. Wade,* 508 U.S. 464, 468, 113 S.Ct. 2187, 2190, 124 L.Ed.2d 424 (1993) (overruled on other grounds by 11 U.S.C. § 1322(e)).

Under § 506(b), the creditor's entitlement to postpetition interest is clearly predicated on the threshold establishment of the two values to be compared, that of the property and the claim. Thus, the first inquiry under § 506(b) is usually a finding of whether the creditor is oversecured and thus entitled to accrue postpetition interest on its claim. In arguing that at some point between the time the petition was filed and confirmation of the Plan, the value of the Hotel became greater than the value of FSA's claim thus entitling FSA to postpetition interest, FSA invites us to consider when valuation should occur for purposes of determining a creditor's entitlement to postpetition interest.

With respect to the first question, the parties in their

9

argument cite this Court to *United Sav. Ass'n. of Texas v. Timbers of Inwood Forest Assoc., Ltd. (In re Timbers of Inwood Forest Assoc., Ltd.),* 793 F.2d 1380 (5th Cir.1986), *on reh'g,* 808 F.2d 363 (5th Cir.1987) (en banc court reinstating panel opinion), *aff'd,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). In *Timbers,* an undersecured creditor sought postpetition interest representing lost "opportunity costs" on the amount of its secured claim under § 362(d) of the Bankruptcy Code. This Court declined the creditor's request and held that an undersecured creditor was not entitled to postpetition interest on the value of its collateral as an element of adequate protection. In reaching its ruling, the *Timbers* court examined other Bankruptcy Code provisions that bore "indirectly" on the question considered. In considering § 506(b) and (c), the Court noted that:

> [t]he timing of the payment of accrued interest to an oversecured creditor (at the conclusion of the proceeding) is doubtless based on the fact that it is not possible to compute the amount of § 506(c) recovery (*and, accordingly the net allowed secured claim on which interest is computed* ) until the termination of the proceeding.

*Timbers,* 793 F.2d at 1407. (emphasis added).

Although beneficial, this language does not answer the question we are presented with in the instant case. In addition, the *Timbers* Court was not confronted with the question we are presented today. We note that the creditor in *Timbers* was undersecured at the time of the adequate protection hearing and its appeal to this Court, and the value of the collateral was not increasing and there was no evidence that future appreciation would

10

provide for post-petition interest.[7]

Under § 506, valuations are to be made in light of the purpose of the valuation. *In re Landing Assoc., Ltd.* 122 B.R. 288 (Bankr.W.D.Tex.1990). We recognize that the value of a debtor's collateral and the amount of a creditor's claim are among the most important issues between the debtor and the secured claimholder. Valuation issues can arise in various contexts throughout the entire bankruptcy case. *See In re Stanley,* 185 B.R. 417 (Bankr.D.Conn.1995). Establishing equity, allowing claims, adequate protection, and plan confirmation are only a few examples of when the issue of valuation can be raised. *Id.* at 423. Neither Bankruptcy Code § 506(b) nor the Bankruptcy Rules define or establish the time for determining valuation of collateral for purposes of § 506(b). *In re Fox,* 142 B.R. 206 (Bankr.S.D.Ohio 1992). The legislative history to § 506(b) is also silent on this point. This Court's research has not disclosed any circuit

---

[7]We also note that *In re Delta Resources, Inc.,* 54 F.3d 722 (11th Cir.), *cert. denied, sub nom. Orix Credit Alliance, Inc. v. Delta Resources, Inc.,* --- U.S. ----, 116 S.Ct. 488, 133 L.Ed.2d 415 (1995), addressed the narrow issue of whether a purportedly oversecured creditor was entitled to receive periodic cash payments for accruing postpetition interest as part of adequate protection in order to preserve the value of its equity cushion. We are not confronted with this question.

In comparing when adequate protection is measured versus interest under § 506(b), the *Delta Resources* court held that a creditor's claim is measured as it existed at the time of the petition date because postpetition interest is limited to the amount by which the claim was oversecured at that time. We agree with this general proposition in the ordinary "underwater" asset case; however, in the context where the collateral is rising and the creditor's claim is decreasing (as in the present case), we find this ruling to be inappropriately narrow.

authority which has discussed the question before us today, although we note that the lower courts that have faced this circumstance have selected a single valuation date. *See, e.g., In re Hulen Park Place, Ltd.,* 130 B.R. 39, 43 (N.D.Tex.1991) (determining whether creditor's claim is oversecured must be determined as of the petition date); *In re Landing Assoc., Ltd.,* 122 B.R. 288, 297 (Bankr.W.D.Tex.1990) (measurement date is confirmation date).[8]

We decline to follow such a narrow path. Therefore, we conclude that for purposes of determining whether a creditor is entitled to accrue interest under § 506(b) in the circumstance where the collateral's value is increasing and/or the creditor's allowed claim has been or is being reduced by cash collateral payments, such that at some point in time prior to confirmation of the debtor's plan the creditor may become oversecured, valuation of the collateral and the creditor's claim should be flexible and not limited to a single point in time, such as the petition date or confirmation date. We further hold that, notwithstanding the bankruptcy court's determination of a creditor's secured status as of the petition date (if such a finding is made), the *party* who contends that there is a dispute as to whether a creditor is

---

[8]Although not controlling, we also recognize that there is ample discussion on the valuation issue in the context of adequate protection. *See, e.g., In re Cason,* 190 B.R. 917 (Bankr.N.D.Ala.1995) (discussing three valuation approaches); *In re Addison Properties Ltd. Partnership,* 185 B.R. 766 (Bankr.N.D.Ill.1995) (same); *see also* Craig H. Averch et al., *The Treatment of Net Rents in Bankruptcy—Adequate Protection, Payments of Interest, Return of Collateral, or Reduction of Debt,* 48 U. Miami L.Rev. 691 (1994).

entitled to interest under § 506(b) must motion the bankruptcy court to make such a determination. The creditor though bears the ultimate burden to prove by a preponderance of evidence its entitlement to postpetition interest, that is, that its claim was oversecured, to what extent, and for what period of time. *In re Grabill Corp.,* 121 B.R. 983, 991-92 (Bankr.N.D.Ill.1990). This ruling recognizes the discretionary nature of bankruptcy courts as courts of equity. However, bankruptcy courts are not precluded from fashioning remedies to prevent unwarranted multiple redeterminations.

A flexible approach recognizes the fact that a creditor's allowed claim, which is being reduced over time, may become entitled to accrue postpetition interest, and that under the plain language of § 506(b) there is nothing limiting that right. *See United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (employing a plain meaning reading of § 506(b)). A flexible approach also recognizes that any increase over the judicially determined valuation during bankruptcy rightly accrues to the benefit of the creditor, and not to the debtor. Moreover, as the bankruptcy court in *In re Addison Properties* noted, the single valuation approach generally balances the bankruptcy process in favor of the debtor. *In re Addison Properties Ltd. Partnership,* 185 B.R. 766, 772 (Bankr.N.D.Ill.1995). Because of the equitable nature of bankruptcy in seeking a balance between debtors and creditors (debtor's right to a fresh start versus the creditor's right to the

13

value of its claim), we reject the single valuation approach under the particular facts of this case.

Thus, applying this ruling to the instant case, if FSA believed that under § 506(b) it was entitled to accrue postpetition interest on its claim during the period following the confirmation hearing, then absent agreement between the parties as to the point in time when FSA's claim became oversecured, FSA was required to motion the bankruptcy court for a redetermination of its secured status. The bankruptcy court in this case was presented with the unusual fact situation where FSA's claim was being reduced and the Hotel's value was appreciating during the time from the petition date to the confirmation hearing. However, the bankruptcy court found that, for the period from the confirmation hearings to Plan confirmation, FSA's claim went from being undersecured to being oversecured and that this would probably occur in October 1994. Because the bankruptcy court made the factual finding as to when FSA would become oversecured, under the particular facts of this case we cannot say that the bankruptcy court was clearly erroneous in its decision.[9]

We next address the accrual of interest under § 506(b) and the extent to which a creditor is entitled to interest under § 506(b). We find this question to be relatively straightforward. The measuring date on which the status of a creditor's collateral

_____

[9]We note that the bankruptcy court found that FSA "probably" would become oversecured sometime in October 1994. Although we find it to be a close question, we are persuaded that the bankruptcy court's finding is supported by the evidence in this case.

14

and claim are compared is determinative of a creditor's right to accrue interest under § 506(b). Thus, a secured creditor's entitlement to accrue interest under § 506(b) matures at that point in time where the creditor's claim becomes oversecured.[10] However, as *Timbers* dictates, accrued interest under § 506(b) is not paid to an oversecured creditor until the plan's confirmation or its effective date, whichever is later. *United Sav. Ass'n. of Texas v. Timbers of Inwood Forest Assoc., Ltd. (In re Timbers of Inwood Forest Assoc., Ltd.),* 793 F.2d 1380, 1381, 1407 (5th Cir.1986), *on reh'g,* 808 F.2d 363 (5th Cir.1987 (en banc court reinstating panel opinion)), *aff'd,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). Thus, to the extent that the bankruptcy court's order does violence to the teachings of *Timbers* by ordering the payment of interest pending confirmation as opposed to ordering interest to accrue, it was error. However, because of the particular facts of this case, we are not inclined to set aside the bankruptcy court's ruling. On the effective date of the Plan's confirmation T-H NOLP would be receiving a credit for the interest paid during this time.

FSA also asserts that it was entitled to the postpetition interest that would have accrued during the entire postpetition preconfirmation period on its claim since the petition date. We disagree. The Supreme Court has made it clear that an oversecured creditor is entitled to postpetition interest on its claim only "to

---

[10]In the instant case, the parties agreed that FSA could accrue interest under § 506(b) when its claim became oversecured. Thus, the parties agreement comports with our reading of the law under § 506(b).

15

the extent that such interest, when added to the principal amount of the claim, [does not] exceed the value of the collateral." *Timbers,* 484 U.S. at 372, 108 S.Ct. at 631; *see also Landmark Financial Serv. v. Hall,* 918 F.2d 1150, 1155 (4th Cir.1990) (an oversecured creditor's claim may include interest up to the value of the collateral). Thus, the amount of interest allowed under § 506(b) is limited to that amount of interest which, when added to the amount of FSA's allowed claim, will not exceed the value of its collateral.

Finally, we address FSA's assertion that the bankruptcy court erred in valuing the Hotel at $13.7 million at the confirmation hearing. The Bankruptcy Code does not prescribe any particular method of valuing collateral, but instead leaves valuation questions to judges on a case-by-case basis. *See* House Rep. No 95-595, 95th Cong. 1st Sess. 216, 356 (1977), *reprinted in* 1978 U.S.S.C.A.N. 5963, 6176, 6312. Valuation is a mixed question of law and fact, the factual premises being subject to review on a clearly erroneous standard, and the legal conclusion being subject to *de novo* review. *In re Clark Pipe & Supply Co., Inc.,* 893 F.2d 693, 697-98 (5th Cir.1990). Value under § 506 is to be determined in light of the purpose of the valuation and of the proposed disposition or use of the property. *Associates Commercial Corp. v. Rash,* No. 96-454, 1997 WL 321231, at *5, --- U.S. ----, ----, --- S.Ct. ----, ----, --- L.Ed.2d ---- (U.S. June 16, 1997); *In re Sandy Ridge Dev. Corp.,* 881 F.2d 1346 (5th Cir.1989). In this particular case, valuation was made for the purpose of plan

16

confirmation. We note that FSA's appraisal expert agreed with T-H NOLP's expert regarding the Hotel's value once FSA's appraisal incorporated the overhead allocation charge, which the bankruptcy court found to be a necessary expense. Therefore, based on our review of the record, we concluded that the bankruptcy court did not err in its valuation of the Hotel. We find FSA's remaining arguments to be without merit.

*2. The Postconfirmation Interest Rate*

The bankruptcy court's calculation of an appropriate "cramdown" interest rate for purposes of Chapter 11 plan confirmation is reviewed for clear error. *In re Briscoe Enter., Ltd., II,* 994 F.2d 1160, 1169 (5th Cir.1993); *see also In re Bryson Properties, XVIII,* 961 F.2d 496, 500 n. 4 (4th Cir.1992). T-H NOLP urges this Court to establish a particular formula for determining an appropriate cramdown interest rate. We decline. As we recognized in *Briscoe,* "[c]ourts have used a wide variety of different rates as benchmarks in computing the appropriate interest rate (or discount rate as it is frequently termed) for the specific risk level in their cases." *Id.* We will not tie the hands of the lower courts as they make the factual determination involved in establishing an appropriate interest rate; they have the job of weighing the witness' testimony, demeanor and credibility. Thus, absent clear error, we will not disturb the bankruptcy court's determination.

In the instant case, the bond financing documents provided for an interest rate of 11.5% per annum. During the confirmation

hearing, the bankruptcy court heard testimony from T-H NOLP's and FSA's financing experts. T-H NOLP's hotel financing expert, Joel Ross, stated that in his opinion the appropriate interest rate that T-H NOLP should pay to FSA under the Plan was 8.45%.[11] On cross-examination, however, Ross admitted that he did not know of any lender to whom he would recommend making this loan at an 8.45% interest rate. FSA's interest rate expert, John Keeling, testified that the appropriate interest rate under the Plan would be 13.6% if the Hotel were valued at $13.7 million, and 14.6% if the Hotel were valued at $15.4 million. Keeling's opinion regarding this interest rate range was based on a lender having the same loan documentation as FSA. Keeling's methodology was to break down the loan into components, and to fix a rate dependent upon how much debt service would be available for each component.[12]

The bankruptcy court, after considering Ross' and Keeling's testimony, concluded that neither interest rate proposed was an appropriate interest rate. The court found that as to Ross' proposed interest rate of 8.45%, this interest rate would not

---

[11]Ross determined this by adding 210 basis points to the two-year U.S. Treasury rate, resulting in an interest rate under the Plan of 8.45% as of September 21, 1994.

[12]According to Keeling's methodology, the first component would comprise 60-70% of the debt and would carry a 9.75% interest rate because a debt service ratio of 1.4 would be available. This component was determined by adding 3.25% to two-year treasuries which were 6.7% as of October 3, 1994. The second component, comprising 10% of the debt (described as mezzanine financing), would carry a 12.75% interest rate. The third component would be serviced as to interest only, no amortization, and would carry a 16.25% interest rate. The fourth component would not receive current interest or amortization and would carry a 25% interest rate.

18

adequately compensate FSA for not receiving its money on the Plan's effective date. With respect to Keeling's proposed interest rate of 13.6%, the bankruptcy court found this rate too high, given that there was expert testimony that the value of the Hotel would increase over the next two years, and evidence that T-H NOLP would be able to make its payments under the Plan. Based on these findings, the bankruptcy court determined that the appropriate cramdown interest rate under 11 U.S.C. § 1129(b)(2)(A)(i)(II) should be the contract rate of 11.5%. We find no reason to disagree.

Bankruptcy Code § 1129(b)(2)(A)(i)(II) has been interpreted to require that the total deferred payments have a present value equal to the amount of the secured claim. *In re Bryson Properties, XVIII,* 961 F.2d 496, 500 (4th Cir.1992). T-H NOLP argues that the postconfirmation interest rate should be 8.45% which would allow FSA to recover the allowed amount of its claim. T-H NOLP relies on footnote 47 in *Briscoe* as support for its argument that in determining the appropriate cramdown interest rate to a secured creditor's claim, this Court should refer to the Treasury rate and add a case-specific risk premium. On the other hand, FSA argues that the interest rate Keeling proffered should be used in the Plan. We decline both suggestions.

Our review discloses that the bankruptcy court's use of the contract rate reflects the present value of FSA's claim and accounts for the specific risk level in this case. We explained in *Briscoe* that "[o]ften the contract rate will be an appropriate

19

rate," *Id.,* and that "[n]umerous courts have chosen the contract rate if it seemed to be a good estimate as to the appropriate discount rate," *Id.* (citing *In re Monnier Bros.,* 755 F.2d 1336 (8th Cir.1985)). In *Briscoe* the risk premium was more than 50% of the riskless rate, whereas in the instant case, the contract rate of 11.5% was more than 1.7 times that of the riskless two-year Treasury rate. The bankruptcy court concluded that the contract rate of 11.5% included a risk premium to account for the increased risk FSA would bear as a claimant under the Plan and for not receiving its money today. In other words, the contract rate was a reasonable rate that adequately compensated for risk. *See Id.* Accordingly, we hold that the bankruptcy court was not clearly erroneous in its determination of the appropriate cramdown interest rate in T-H NOLP's amended Plan.

*3. T-H NOLP's Amended Plan of Reorganization*

We now turn to FSA's arguments regarding T-H NOLP's amended Plan and the bankruptcy court's confirmation of the amended Plan. On appeal, FSA contends that T-H NOLP's Plan was not feasible under Bankruptcy Code § 1129(a)(11), that the Plan was not proposed in good faith under § 1129(a)(3), and that the Plan was a liquidating Plan under § 1141(d)(3). We address each of these in turn.

*A. The § 1129(a)(11) Feasibility Requirement*

Section 1129(a)(11) codifies the feasibility requirement and requires that confirmation of the plan is not likely to be followed by liquidation or the need for further financial reorganization, unless such liquidation or reorganization is proposed in the plan.

20

11 U.S.C. § 1129(a)(11). To allow confirmation, the bankruptcy court must make a specific finding that the plan as proposed is feasible. *In re M & S Assoc., Ltd.,* 138 B.R. 845, 848 (Bankr.W.D.Tex.1992). The standard of proof required by the debtor to prove a Chapter 11 plan's feasibility is by a preponderance of the evidence, *Briscoe,* 994 F.2d at 1165, and we review the bankruptcy court's finding that a debtor's plan is feasible under the clearly erroneous standard. *Id.* at 1166.

In determining whether a debtor's Chapter 11 plan of reorganization is feasible, we noted in *Briscoe* that "the [bankruptcy] court need not require a guarantee of success ..., [o]nly a reasonable assurance of commercial viability is required." *Id.* at 1165-66; *see also Kane v. Johns-Manville Corp.,* 843 F.2d 636 (2nd Cir.1988). All the bankruptcy court must find is that the plan offer "a reasonable probability of success." *In re Landing Assoc., Ltd.,* 157 B.R. 791, 820 (Bankr.W.D.Tex.1993).

The bankruptcy court found that the Plan was feasible based on the following: (1) that T-H NOLP would be able to service the debt at an 11.5% interest rate with an infusion of capital by the principals as modified in the Plan; (2) the earning power of T-H NOLP after the reorganization; (3) the past performance of T-H NOLP's business operations; (4) the ability of T-H NOLP's management; and (5) the economic picture for hotels in New Orleans. Based on these findings, the bankruptcy court found that T-H NOLP's Plan had a reasonable assurance of commercial viability.

FSA argues that the Plan does not satisfy the feasibility

requirement of § 1129(a)(11) because T-H NOLP cannot fulfill its commitments during the initial two years under the Plan. FSA primarily contends that T-H NOLP erred by using higher revenue projections for showing feasibility while using lower projections for collateral valuations, that there was no basis to believe that T-H NOLP's revenue projections would be obtained, and that the Hotel's value would have to appreciate in order to satisfy the Plan.[13]

FSA has not asserted any "clear error" basis that would warrant reversal of the bankruptcy court's feasibility finding. With respect to FSA's contention regarding how the projections were utilized and that the revenues projected could not be obtained, we cannot conclude that the bankruptcy court erred in determining that T-H NOLP's Plan was feasible. We agree with the notion that "[w]here the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible." *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 508 n. 20 (Bankr.S.D.Tex.1989). Debtors are not required to view business and economic prospects in the worst possible light. *In re Western Real Estate Fund, Inc.,* 75 B.R. 580, 585 (Bankr.W.D.Okla.1987). The factors set forth by the bankruptcy court as to the feasibility of T-H NOLP's Plan are not untenable nor unreasonable. Our review

---

[13]FSA also asserts that if the Hotel is sold under the Plan, there is no credit worthiness test for the new purchaser. However, we note that FSA does not disclose how this affects the Plan's feasibility, and we refuse to speculate on this point without references to the record or legal authority.

of the evidence discloses that actual net revenues increased by over eight percent from 1993 to 1994, and that for the year 1994 the actual net operating cash flow was greater than the amount projected for that year. Moreover, as stated previously, the Hotel's revenue stream has enabled T-H NOLP to reduce the amount of FSA's claim considerably since the petition date. In addition, the evidence reflects a reasonable expectation that the payments required to be made during the term of the Plan will be made. Thus, we find no clear error regarding feasibility on this point.

Regarding FSA's argument that the Hotel's value will have to appreciate in order the satisfy the Plan, the bankruptcy court found that T-H NOLP could pay off FSA's claim. As stated above, the Plan included several alternatives which could reasonably result in the full payment of FSA's claim; for example, by refinancing, a balloon payment at the end of twenty-four months, the sale of the Hotel to a third party, or a *dation en paiement.* In *In re Nite Lite Inns,* 17 B.R. 367, 369-70 (Bankr.S.D.Cal.1982), the bankruptcy court found feasible a plan which contemplated liquidation in the event the debtor defaulted, since such liquidation was proposed in the plan. *See also In re Sandy Ridge Dev. Corp.,* 881 F.2d 1346 (5th Cir.1989) (finding that a liquidating reorganization under Chapter 11 did not violate § 1129(a)(11)). We agree with the bankruptcy court in *Nite Lite Inns,* that a debtor's plan is feasible where at least one of the alternative proposals is feasible. Therefore, because T-H NOLP's Plan included several alternatives which would fully satisfy FSA's

23

claim, we conclude that the bankruptcy court did not err in finding that the Plan was feasible under § 1129(a)(11).

 *B. The § 1129(a)(3) Good Faith Requirement*

Section 1129(a)(3) requires that a debtor's plan be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3). The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start. *In re Sun Country Dev., Inc.,* 764 F.2d 406, 408 (5th Cir.1985). "Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied." *Id.* A debtor's plan may satisfy the good faith requirement even though the plan may not be one which the creditors would themselves design and indeed may not be confirmable. *In re Briscoe Enter., Ltd., II,* 994 F.2d 1160, 1167 (5th Cir.1993). The standard of proof required by the debtor to prove a Chapter 11 plan was proposed in good faith is by a preponderance of the evidence. *Id.* at 1165.

The Plan in this case provided that T-H NOLP would make payments for twenty-four months commencing on the Plan's effective date. In addition, the Plan proposed various time lines during which the classes of claim would be extinguished, including FSA's claim. The bankruptcy court found that the Plan was proposed in good faith.

FSA contends that the Plan was not proposed in good faith for

24

two reasons. First, FSA argues that under the Plan, T-H NOLP is required to actively market the Hotel for the highest possible price and, although FSA bid its full claim at the confirmation hearing, T-H NOLP did not sell. Thus, FSA contends that T-H NOLP's refusal to sell amounts to a lack of good faith. We disagree with FSA's assertion.

This Court's review of the amended Plan disclosed that if T-H NOLP received an offer to purchase the Hotel, the Trustee (FSA) had a right of first refusal. Amended Plan Article 5(E). If FSA elected to acquire the Hotel pursuant to its right of first refusal, FSA had the right to credit bid an amount up to the allowed amount of its final allowed claim. Amended Plan Article 5(F). During the confirmation hearing, FSA's counsel asked Maria Cheng, FSA's Vice President, "if the Debtor were to put the hotel up for sale today, is FSA ready, willing and able to ... credit bid [the amount of its claim]." Cheng responded affirmatively. (Confirmation Hearing Transcript p. 107). However, we note that there were no other parties present at the hearing which offered to purchase the Hotel and, thus, based on the plain language of the Plan, FSA's right of first refusal never matured. *See, e.g., In re Table Talk, Inc.,* 53 B.R. 937 (Bankr.D.Mass.1985) (right of first refusal granted to bidder by trustee was exercisable after competitive bid was proffered). Consequently, we find that FSA's argument on this point must fail.

Secondly, FSA argues that T-H NOLP's control persons commenced bankruptcy proceedings for all six partnerships in four

25

different courts, and that because T-H NOLP resisted FSA's efforts to consolidate the instant case with the other bankruptcy cases taking place in other jurisdictions, T-H NOLP's Plan was not proposed in good faith. The bankruptcy court denied FSA's requests to consolidate or change venue. We find FSA's argument meritless. We cannot see any nexus between the "good faith" requirement and T-H NOLP's resisting consolidation of the instant case which would preclude a debtor's plan from being proposed in good faith. Accordingly, we refuse to read into the statutory requirement of "good faith" a mandate that the debtor is precluded from resisting any attempt by a creditor, such as FSA, to consolidate bankruptcy proceedings. FSA's contention has no bearing on whether the proposed plan will result in reorganization of T-H NOLP or whether the Plan has a reasonable hope of success. Based on the above, we find that the bankruptcy court did not err in determining that T-H NOLP's Plan was proposed in good faith.

*C. § 1141(d)(3) & Liquidating Plans*

Generally, under § 1141(d)(1)(A) of the Bankruptcy Code, confirmation of a plan of reorganization grants the Chapter 11 debtor a discharge of all debts arising prior to confirmation. 11 U.S.C. § 1141(d)(1)(A). However, § 1141(d)(3) provides that in a Chapter 11 case the debtor may be denied discharge upon confirmation of the plan if the following three requirements are present: (1) the plan provides for the liquidation of all or substantially all of the property of the estate (§ 1141(d)(3)(A)); (2) the debtor does not engage in business after consummation of

26

the plan (§ 1141(d)(3)(B)); *and* (3) the debtor would be denied a discharge under § 727(a) of this title if the case were a case under chapter 7 of this title (§ 1141(d)(3)(C)). 11 U.S.C. § 1141(d)(3).

The bankruptcy court and the district court found that the Plan was not a liquidation plan because the Plan did not satisfy the three nondischarge requirements of § 1141(d)(3). On appeal, FSA argues that the Plan was a liquidation plan since under the Plan, T-H NOLP will operate the Hotel for only twenty four months or until the Hotel is sold or otherwise disposed of, whichever occurs first. In addition, FSA asserts that the bankruptcy court's reasoning was erroneous. We disagree, and affirm the bankruptcy court's reading of § 1141(d)(3).

Under the first requirement, the plan must "provide[ ] for the liquidation of all or substantially all of the property of the estate." 11 U.S.C. § 1141(d)(3)(A).[14] According to T-H NOLP's

---

[14]The legislative history to § 1141(d) states:

> Paragraph (3) specifies that the debtor is not discharged by the confirmation of a plan if the plan is a liquidating plan and if the debtor would be denied a discharge in a liquidation case under Section 727. Specifically, if all or substantially all of the distribution under the plan is of all or substantially all of the property of the estate or the proceeds of it, if the business, if any, of the debtor does not continue, and if the debtor would be denied a discharge under section 727 (such as if the debtor were not an individual or if he had committed an act that would lead to denial of discharge), then the Chapter 11 discharge is not granted.

House Rep. No. 95-595, 95th Cong. 1st Sess. 418-19 (1977), *reprinted in,* 1978 U.S.C.C.A.N. 5963, 6374-75.

27

Plan, there are three options with respect to the Hotel: (1) the refinancing of FSA's debt and paying FSA in full; (2) the sale of the Hotel; or (3) the transfer of the Hotel to FSA in satisfaction of its nonrecourse debt. The first option proposed by T-H NOLP does not result in liquidation of the property, but instead results in liquidation of FSA's claim, and obviously is the one preferred by T-H NOLP. Moreover, if T-H NOLP is successful in refinancing the debt, its business operations will continue. The record discloses that during the two-year period following the effective date of the Plan,[15] T-H NOLP will pursue the refinancing option simultaneously with its efforts to market the Hotel under the second option. However, no evidence was presented to support the fact that refinancing within two years was so unlikely that sale of the Hotel (option two under the Plan) or *dation en paiement* (option three under the Plan) were the only viable options. We also note that FSA fails to cite any authority for the proposition that where one alternative of a Plan is liquidation of the property two years after a plan's effective date, it constitutes a liquidation under 1141(d)(3)(A). We refuse to so hold. Because requirement (A) of § 1141(d)(3) is not met and this section requires that all three requirements be present in order to deny the debtor a discharge, we conclude that the bankruptcy court was correct in finding that T-H

---

[15]T-H NOLP's conducting business for two years following Plan confirmation satisfies § 1141(d)(3)(B). *Compare In re Wood Family Interests, Ltd.,* 135 B.R. 407 (Bankr.D.Colo.1989) (holding that partnership debtor was not entitled to a discharge where its reorganization plan provided for discontinuation of its business upon confirmation).

28

NOLP's Plan was not a liquidation plan.  FSA's remaining arguments that T-H NOLP's Plan is a liquidating plan are meritless.

*CONCLUSION*

Based on the foregoing discussion, the district court's judgment affirming the bankruptcy court's judgment is AFFIRMED.

AFFIRMED.