# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 26, 2013

Lyle W. Cayce
Clerk

No. 12-10271

In the Matter of:  VILLAGE AT CAMP BOWIE I, L.P.,

                                                    Debtor

------------------------------

WESTERN REAL ESTATE EQUITIES, L.L.C.,

                                                    Appellant

v.

VILLAGE AT CAMP BOWIE I, L.P.,

                                                    Appellee

Appeal from the United States Bankruptcy Court
for the Northern District of Texas

Before HIGGINBOTHAM, CLEMENT, and HAYNES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Western Real Estate Equities, LLC ("Western") appeals a bankruptcy court order confirming a Chapter 11 cramdown plan and denying Western's motion for relief from the automatic stay.  We affirm.

No. 12-10271

## I.

The appellee, Village at Camp Bowie I, LLC ("the Village"), owns a parcel of real estate in west Fort Worth, Texas. The real estate includes unimproved land as well as several buildings, which the Village leases out for retail and office space. The Village itself has no employees, and a third-party independent contractor handles the day-to-day management of the property on a fee basis.

The Village acquired and improved the property in 2004, investing approximately $10,000,000 of its own equity capital and obtaining the balance of the necessary financing by executing short-term promissory notes ("the Notes") in favor of SouthTrust Bank and Texas Capital Bank. The Notes were secured by the property. Neither of the original lenders is a party to this suit. By a series of mergers, Wells Fargo National Bank — also not a party to this case — succeeded the original lenders as owner of the Notes.

The Notes were originally scheduled to mature on January 22, 2008. However, occupancy at the Village's property lagged behind that of similar properties in the west Fort Worth submarket. Unable to pay the Notes as they came due, the Village entered into a series of modification agreements with Wells Fargo that postponed maturity until February 11, 2010. On that date, the Village defaulted on the Notes. Thereafter, the Village negotiated a series of forbearance agreements by which Wells Fargo agreed to temporarily forego its state law remedies. After the final forbearance period expired on July 9, 2010, Wells Fargo auctioned off the Notes to Western, the appellant, at a discount from their face value.

Western purchased the Notes with an eye toward displacing the Village as owner of the underlying real estate. Pursuant to this objective, Western posted the Village for a non-judicial foreclosure immediately after acquiring the Notes. On August 2, 2010 — the day before the scheduled foreclosure sale — the Village filed its Chapter 11 petition, staying the foreclosure proceedings. As of

2

No. 12-10271

the petition date, the outstanding principal on the Notes was $32,112,711. The Village also owed $59,398 in unsecured pre-petition debt to thirty-eight miscellaneous trade creditors. The trade creditors are independent third parties who furnish the Village with services including maintenance, landscaping, power, roof repair, and accounting.

On August 10, 2010, Western filed a motion for relief from the automatic stay under 11 U.S.C. § 362(d), arguing that the Village had no equity in its real estate and no prospect of proposing a confirmable reorganization. The court took Western's motion under advisement but did not lift the stay, concluding that the Village had some equity in its property. The court subsequently determined that the value of the Village's real estate was $34,000,000, significantly more than the allowable claims of its creditors.

On November 29, 2010, the Village filed its original plan of reorganization. The bankruptcy court indicated that the plan was unconfirmable because the proposed equity infusion from the Village's pre-petition owners was too small to stabilize the property.[1] Thereafter, the Village filed a series of amendments and modifications to its original plan, culminating in the filing of its modified second amended plan. The plan designated only two voting, impaired creditor classes, one consisting of Western's secured claim and the other consisting of the unsecured trade debt. Under the plan, Western would receive a new five-year note in the amount of its secured claim, with interest accruing at 5.84% per annum, and with a balloon payment of the remaining principal and accrued interest due at maturity.[2] Moreover, the plan proposed to pay the class of unsecured trade claims in full within three months from the effective date,

---

[1] In the real estate context, "stabilization" means that the subject property, charging market rate rentals, has reached an occupancy level consistent with the surrounding submarket.

[2] Prior to confirmation, the Village agreed to increase the interest rate to 6.4%.

No. 12-10271

without interest.    Finally, the plan provided that the Village's pre-petition owners and related parties would make a capital infusion of $1,500,000 in exchange for newly issued preferred equity.

While all thirty-eight unsecured trade creditors voted to accept the plan, Western voted its much larger secured claim against it.    The bankruptcy court held a three-day hearing to determine whether it could confirm the plan under 11 U.S.C § 1129 notwithstanding Western's objection.    During the hearing, Western complained that the Village's plan failed a number of the conditions for confirmation set forth in § 1129.    Among other things, Western argued that the plan offended § 1129(a)(10), which requires that a plan garner the vote of "at least one class of claims that is impaired under the plan."    Here, Western observed, the Village's plan minimally impaired the unsecured trade creditors by proposing to pay them in full, but over a period of three months after plan confirmation without interest.[3]    Western argued that the Village impaired the trade claims solely to create an accepting impaired class, pointing to the undisputed fact that the Village had the cash flow to pay off the trade claims in full at plan confirmation.    As the trade claims were thus "artificially" impaired, Western reasoned, their acceptance could not satisfy § 1129(a)(10).    In the alternative, Western argued, the Village's tactics constituted an abuse of the bankruptcy process that violated the good faith requirement of § 1129(a)(3).

The bankruptcy court agreed that the Village had the financial wherewithal to leave its trade creditors unimpaired.    However, it rejected Western's theory that § 1129(a)(10) distinguishes between artificial and economically driven impairment, observing that:

---

[3] Western calculates that at the applicable judgment rate, the total economic impairment suffered by the unsecured trade claims amounts to roughly $900 in foregone interest.

4

> [As] the definition of impairment in Code § 1124 is clear — and broad — and [as] Congress did not, as it might have, condition the accepting class requirement of section 1129(a)(10) on meaningful impairment of that class, the latter section cannot be read to require any particular degree of impairment.

Moreover, while the court suggested that artificial impairment is a factor to consider in determining whether a plan proponent has satisfied its duty of good faith under § 1129(a)(3), it concluded that "in the usual case, artificial impairment does not amount per se to a failure of good faith." Here, the court observed, the Village had proposed its plan for the legitimate bankruptcy purposes of reorganizing its debts, continuing its real estate venture, and preserving its non-trivial equity in its real estate. Moreover, the court determined, the Village would likely be able to stay current on its restructured obligations. Thus, the court concluded, the Village satisfied § 1129(a)(3).

After the Village agreed to make certain modifications not relevant to this appeal, the bankruptcy court confirmed the Village's plan. Western appeals.

## II.

On appeal, Western reasserts its theory that a plan proponent cannot "artificially" impair a friendly class of creditors solely to create the impaired accepting class necessary to satisfy § 1129(a)(10). Western predicates its theory on both § 1129(a)(10) as well as the separate good faith requirement of

§ 1129(a)(3).[4] As Western's arguments raise questions of statutory construction, we review *de novo*.[5]

We begin by examining the relevant provisions of the Bankruptcy Code. Section 1129(a)(10) prohibits a court from confirming a plan of reorganization unless "at least one class of claims that is impaired under the plan has accepted the plan."[6] Section 1124 explains that a plan impairs a class of claims unless it "leaves unaltered the legal, equitable, and contractual rights" of the claim holders.[7] Section 1123(b)(1) provides that "a plan may impair or leave unimpaired any class of claims."[8] Lastly, § 1129(a)(3) requires a plan proponent to "propose [its plan] in good faith and not by any means forbidden by law."[9]

Circuits have divided over the question of whether § 1129(a)(10) draws a distinction between artificial and economically driven impairment. At the one end of the spectrum, the Eighth Circuit held in *Matter of Windsor on the River Associates, Ltd.*[10] that "a claim is not impaired [for purposes of § 1129(a)(10)] if the alteration of the rights in question arises solely from the debtor's exercise of

---

[4] Western also posits that artificial impairment offends the "fair and equitable" requirement of § 1129(b)(2), but this argument is a non-starter. A plan is "fair and equitable" to a secured creditor if it allows the creditor to (i) retain its lien to the extent of the allowed amount of its secured claim and (ii) receive deferred cash payments of a value equal to the allowed amount of its secured claim. *See* 11 U.S.C. § 1129(b)(2)(A)(i). The bankruptcy court found that the Village's plan satisfied both elements of this mechanical test, a finding Western does not appeal.

[5] *Matthews v. Remington Arms Co.*, 641 F.3d 635, 641 (5th Cir. 2011).

[6] 11 U.S.C. § 1129(a)(10).

[7] *Id.* § 1124(1).

[8] *Id.* § 1123(b)(1).

[9] *Id.* § 1129(a)(3).

[10] 7 F.3d 127 (8th Cir. 1993).

No. 12-10271

discretion."[11]    Under the Eighth Circuit's approach, § 1129(a)(10) recognizes impairment only to the extent that it is driven by economic "need."[12]

At the other end of the spectrum, the Ninth Circuit held in *Matter of L&J Anaheim Associates*[13] that § 1129(a)(10) does not distinguish between discretionary and economically driven impairment, observing that "the plain language of section 1124 says that a creditor's claim is 'impaired' unless its rights are left 'unaltered' by the [p]lan," and that "[t]here is no suggestion here that only alterations of a particular kind or degree can constitute impairment."[14] However, the Ninth Circuit left open the possibility that discretionary impairment could offend a plan proponent's duty of good faith under § 1129(a)(3).[15]

For its part, this Circuit has yet to stake out a clear position in the debate over artificial impairment.  In *Matter of Sun Country Development, Inc.,*[16] we rejected the concept of artificial impairment altogether, both as a matter of the good faith requirement of § 1129(a)(3), and — at least implicitly — as a matter

---

[11] *Id.* at 132.

[12] *Id.* at 132–33.  To date, no other circuit has adopted the Eighth Circuit's reasoning. Although the Third Circuit cited *Windsor* with approval in *Matter of Combustion Engineering*, it did not actually confront artificial impairment, at least as the concept was defined in *Windsor*.  *See* 391 F.3d 190, 242 (3d Cir. 2004).  In *Combustion Engineering,* it was undisputed that the debtor's cramdown plan materially impaired all unsecured claims.  *See id.*  The Third Circuit expressed concern over the debtor's pre-petition payments to a favored group of tort claimants, suggesting that the debtor made the payments with the tacit understanding that the favored claimants would vote their materially impaired claims to support its plan.  *See id.* at 244–45.  Though the Third Circuit suggested that the debtor's scheme "may constitute artificial impairment," it ultimately cited *Windsor* for the proposition that § 1129(a)(10) serves a "monitoring function" undermined by the debtor's pre-petition bribes.  *Id.* at 243–45.

[13] 995 F.2d 940 (9th Cir. 1993).

[14] *Id.* at 943.

[15] *Id.* at 943 n.2.

[16] 764 F.2d 406 (5th Cir. 1986).

of the voting requirement of § 1129(a)(10).[17]   However, as we ultimately concluded that the impairment before us was economically motivated,[18] we deprived our analysis of artificial impairment of precedential force.  Moreover, in our subsequent decision in *Matter of Sandy Ridge Development Corp.*,[19] we voiced concern with artificial impairment in a single-asset reorganization analogous to the case at bar, remanding to the bankruptcy court to "consider the issue in light, *inter alia*, of the requirement of good faith."[20]

Today, we expressly reject *Windsor* and join the Ninth Circuit in holding that § 1129(a)(10) does not distinguish between discretionary and economically driven impairment.  As the *Windsor* court itself acknowledged, § 1124 provides that "any alteration of a creditor's rights, no matter how minor, constitutes 'impairment.'"[21]  By shoehorning a motive inquiry and materiality requirement into § 1129(a)(10), *Windsor* warps the text of the Code, requiring a court to "deem" a claim unimpaired for purposes of § 1129(a)(10) even though it plainly qualifies as impaired under § 1124.[22]  *Windsor*'s motive inquiry is also inconsistent with § 1123(b)(1), which provides that a plan proponent "*may*

---

[17] *Id.* at 408 ("[The secured creditor's] claim that the unsecured creditors' status was changed to [satisfy § 1129(a)(10)] does not go to [the debtor's good faith].  Congress made the cram down available to debtors; use of it to carry out a reorganization cannot be bad faith.").

[18] *Id.*

[19] 881 F.2d 1346 (5th Cir. 1989).

[20] *Id.* at 1347, 1353.

[21] *Windsor*, 7 F.3d at 130; *see also* COLLIER ON BANKRUPTCY ¶ 1124.03 (16th ed. rev. 2012) ("Any alteration of . . . rights constitutes impairment, even if the value of the rights is enhanced. There is no suggestion that only alterations of a particular kind or degree can constitute impairment." (internal quotation marks omitted) (citations omitted)).

[22] *E.g.*, *In re Dunes Hotel Assocs.*, 188 B.R. 174, 185 (Bankr. D.S.C. 1995); *see also Windsor*, 7 F.3d at 132.  *Windsor*'s interpretation of the Code has received a chilly reception from bankruptcy commentators.  *See, e.g.*, NORTON BANKRUPTCY LAW AND PRACTICE 3d § 109:7 (William L. Norton, Jr., ed., 2012) ("[*Windsor*] held that artificial impairment is not proper. The[] case[] appear[s] to be contrary to a plain reading of the statute.").

impair or leave unimpaired any class of claims," and does not contain any indication that impairment must be driven by economic motives.[23]

The *Windsor* court justified its strained reading of §§ 1129(a)(10) and 1124 on the ground that "Congress enacted section 1129(a)(10) . . . to provide some indicia of support [for a cramdown plan] by affected creditors," reasoning that interpreting § 1124 literally would vitiate this congressional purpose.[24] But the Bankruptcy Code *must* be read literally, and congressional intent is relevant only when the statutory language is ambiguous.[25] Moreover, even if we were inclined to consider congressional intent in divining the meaning of §§ 1129(a)(10) and 1124, the scant legislative history on § 1129(a)(10) provides virtually no insight as to the provision's intended role,[26] and the Congress that passed § 1124 considered and rejected precisely the sort of materiality requirement that *Windsor* has imposed by judicial fiat.[27]

The *Windsor* court also reasoned that condoning artificial impairment would "reduce [§ 1129](a)(10) to a nullity."[28] But this logic sets the cart before

---

[23] 11 U.S.C. § 1123(b)(1) (emphasis added).

[24] *Windsor*, 7 F.3d at 131 (citing *In re Polytherm Indus., Inc.*, 33 B.R. 823, 833 (Bankr. W.D. Wis. 1983) (quoting S. Rep. No. 96-305, at 15 (1979))).

[25] *Toibb v. Radloff*, 501 U.S. 157, 160–62 (1991).

[26] *E.g.*, NATIONAL BANKRUPTCY CONFERENCE, REFORMING THE BANKRUPTCY CODE: THE NATIONAL BANKRUPTCY CONFERENCE'S CODE REVIEW PROJECT 277 (1994) (noting that the legislative history of § 1129(a)(10) "is murky, shedding little light on its intended role"); Scott F. Norberg, *Debtor Incentives, Agency Costs, and Voting Theory in Chapter 11*, 46 U. KAN. L. REV. 507, 538 (1998) (noting that "[t]he legislative history . . . sheds little light on the rationale for section 1129(a)(10)").

[27] NORTON, *supra* note 22, at § 109:7. Specifically, Congress rejected proposed legislation that would have required a creditor to be "materially and adversely affected" in order to gain the right to vote on a reorganization under § 1124. *In re Barrington Oaks General P'ship*, 15 B.R. 952, 959–61 (Bankr. Ut. 1981) (quoting 124 Cong. Rec. H11,103 (daily ed. Sept. 28, 1978); 124 Cong. Rec. S17,419-17,420 (daily ed. Oct. 6, 1978)).

[28] 7 F.3d at 131 (citation omitted).

the horse, resting on the unsupported assumption that Congress intended § 1129(a)(10) to implicitly mandate a materiality requirement and motive inquiry.[29] Moreover, it ignores the determinative role § 1129(a)(10) plays in the typical single-asset bankruptcy, in which the debtor has negative equity and the secured creditor receives a deficiency claim that allows it to control the vote of the unsecured class.[30] In such circumstances, secured creditors routinely invoke § 1129(a)(10) to block a cramdown,[31] aided rather than impeded by the Code's broad definition of impairment.[32]

Western insists that "the real issue here is not one of statutory construction," urging that "courts do not apply a plain meaning test to the provisions of the . . . Code where the issue is one of manipulating the bankruptcy process." Specifically, Western points to our decision in *Matter of Greystone III*

---

[29] As Professor David Carlson of Yeshiva University has observed:

The better view is simply . . . that the purpose of § 1129(a)(10) is to assure at least a little support for what the debtor is doing[,] [and that] [w]hen trade creditors vote yes on their own impairment, creditor support has been demonstrated, even if trade creditors hold a low percentage of the total claim.

David Gray Carlson, *Artificial Impairment and the Single Asset Chapter 11 Case*, 23 CAP. U. L. REV. 339, 376 (1994).

[30] *See, e.g., In re Nw. Timberline Enters., Inc.*, 348 B.R. 412, 436 (Bankr. N.D. Tex. 2006). While debtors have attempted to prevent this outcome by placing the trade claims and deficiency claims into separate unsecured classes, many circuits — including this Circuit — have held that such gerrymandering is prohibited by the classification rules of § 1122. *See, e.g., In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir. 1991); *In re Boston Post Rd. Ltd. P'ship*, 21 F.3d 477, 483 (2d Cir. 1994); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 160–61 (3d Cir. 1993); *In re Lumber Exch. Bldg. Ltd. P'ship*, 968 F.2d 647, 648–49 (8th Cir. 1992).

[31] *See, e.g., Nw. Timberline Enters.*, 348 B.R. at 436. Section 1129(a)(10) also occasionally prevents confirmation in classical business bankruptcies. *See, e.g., In re Tribune Co.*, 464 B.R.126, 180 (Bankr. D. Del. 2011).

[32] A class of claims only gains the right to vote on a reorganization — both generally and for purposes of § 1129(a)(10) — if it is "impaired" within the meaning of § 1124. *See* 11 U.S.C. §§ 1126(f), 1129(a)(10).

No. 12-10271

*Joint Venture,*[33] in which we held that a plan proponent cannot gerrymander creditor classes solely for purposes of obtaining the impaired accepting class necessary to satisfy § 1129(a)(10).[34]  Western reads *Greystone* to enunciate a broad, extrastatutory policy against "voting manipulation" and urges that prohibiting artificial impairment is merely the next logical extension of this policy.[35]    However, Western brushes over the fact that *Greystone*'s anti-gerrymandering principle resolves an ambiguity left open by the classification rules set forth in § 1122.[36]  *Greystone* does not stand for the proposition that a court can ride roughshod over affirmative language in the Bankruptcy Code to enforce some Platonic ideal of a fair voting process.

As we suggested in *Sandy Ridge*, a plan proponent's motives and methods for achieving compliance with the voting requirement of § 1129(a)(10) must be scrutinized, if at all, under the rubric of § 1129(a)(3), which imposes on a plan proponent a duty to propose its plan "in good faith and not by any means forbidden by law."[37]  Good faith should be evaluated "in light of the totality of the circumstances surrounding establishment of [the] plan," mindful of the purposes underlying the Bankruptcy Code.[38]  Generally, "[w]here [a] plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of

---

[33] 995 F.2d 1274 (5th Cir. 1991).

[34] *Id.* at 1277–81.

[35] Class gerrymandering tends to arise in single-asset bankruptcies where the debtor's real estate is worth *less* than the secured creditor's claim, in which case the secured creditor receives an unsecured claim in the amount of the deficiency.  *See supra* note 30 and accompanying text.

[36] *See* 995 F.2d at 1278–81.

[37] 11 U.S.C. § 1129(a)(3).

[38] *In re Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 519 (5th Cir. 1998).

success, the good faith requirement of § 1129(a)(3) is satisfied."[39]   We review a bankruptcy court's § 1129(a)(3) analysis only for clear error.[40]

Here, the bankruptcy court determined that the Village had not run afoul of § 1129(a)(3), as it had proposed a feasible cramdown plan for the legitimate purposes of reorganizing its debts, continuing its real estate venture, and preserving its non-trivial equity in its properties.  Western does not dispute that the Village will be able to stay current on its restructured obligations or that it has significant equity in its properties, instead relying wholly on the theory that artificial impairment constitutes bad faith as a matter of law — a theory that has no basis in the Code or our precedents.[41]  On this record, we cannot conclude that the district court clearly erred in its § 1129(a)(3) analysis, particularly as we have recognized that a single-asset debtor's desire to protect its equity can be a legitimate Chapter 11 objective.[42]

We emphasize, however, that our decision today does not circumscribe the factors bankruptcy courts may consider in evaluating a plan proponent's good

---

[39] *In re T-H New Orleans P'ship*, 116 F.3d 790, 802 (5th Cir. 1997) (quoting *Sun Country*, 764 F.2d at 408).

[40] *See Cajun Elec. Power*, 150 F.2d at 519.

[41] *See Sun Country*, 764 F.2d at 408 ("Brite's claim that the unsecured creditors [were artificially impaired to] effectuate the cram down does not go to whether the purpose of Sun Country's proposed plan is to reorganize or whether the plan has a reasonable hope of success."); *cf. T-H New Orleans*, 116 F.3d at 802 ("[W]e refuse to read into the statutory requirement of 'good faith' a mandate that the debtor is precluded from resisting any attempt by a creditor, such as FSA, to consolidate bankruptcy proceedings. FSA's contention has no bearing on whether the proposed plan will result in reorganization of T-H NOLP or whether the Plan has a reasonable hope of success.").

[42] *In re Humble Place Joint Venture*, 936 F.2d 814, 818 (5th Cir. 1991) ("There are several instances where even one-asset real estate ventures would invoke Chapter 11 in good faith: . . . even a venture including undeveloped property might file to protect true owner equity."); *see also In re Dollar Assocs.*, 172 B.R 945, 949–50 (Bankr. N.D. Cal. 1994); *In re Tucker*, 479 B.R. 873, 879 (Bankr. D. Or. 2012); *In re Goulding Place Dev., Inc.*, 99 B.R. 493 (Bankr. N.D. Ga. 1989).

faith. In particular, though we reject the concept of artificial impairment as developed in *Windsor*, we do not suggest that a debtor's methods for achieving literal compliance with § 1129(a)(10) enjoy a free pass from scrutiny under § 1129(a)(3). It bears mentioning that Western here concedes that the trade creditors are independent third parties who extended pre-petition credit to the Village in the ordinary course of business. An inference of bad faith might be stronger where a debtor creates an impaired accepting class out of whole cloth by incurring a debt with a related party, particularly if there is evidence that the lending transaction is a sham.[43] Ultimately, the § 1129(a)(3) inquiry is fact-specific, fully empowering the bankruptcy courts to deal with chicanery. We will continue to accord deference to their determinations.

## III.

In addition to challenging plan confirmation, Western seeks to appeal the bankruptcy court's order denying its § 362(d) motion to lift the stay. Western reasons that the Village cannot satisfy § 1129(a)(10) without recourse to impermissible artificial impairment, and that its patent inability to propose a confirmable plan constitutes cause that warrants lifting the stay. As we have concluded that the bankruptcy court did not err in confirming the Village's plan, Western's theory of cause necessarily also fails.

## IV.

The judgment of the bankruptcy court is AFFIRMED.

---

[43] *Cf. In re Ingleside Assocs.*, 136 B.R. 955, 961 (Bankr. E.D. Pa. 1992) (disregarding the accepting votes of creditors who, though not technically "insiders," were under common control with the debtor and held "intercompany debts . . . which ha[d] virtually no real substance").