**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**FILED**
September 16, 2015

Lyle W. Cayce
Clerk

No. 14-50046

In the Matter of:  AGE REFINING, INCORPORATED,

                                        Debtor

------------------------------

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

                                        Appellant

v.

ERIC J. MOELLER, Chapter 11 Trustee for AGE Refining, Incorporated,

                                        Appellee

In the Matter of:  AGE REFINING, INCORPORATED,

                                        Debtor

------------------------------

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

                                        Appellant

v.

CHASE CAPITAL CORPORATION; LIQUIDATING TRUSTEE RANDOLPH
N. OSHEROW,

                                        Appellees

In the Matter of:  AGE REFINING, INCORPORATED,

                                        Debtor

------------------------------

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

                                        Appellant

v.

RANDOLPH N. OSHEROW, Chapter 11 Trustee,

                                        Appellee

Appeal from the United States District Court
for the Western District of Texas

No. 14-50046

Before JOLLY, HIGGINBOTHAM, and OWEN, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The Official Committee of Unsecured Creditors (the "Committee") appeals a consolidated district court judgment affirming several bankruptcy court judgments. The bankruptcy court approved a Rule 9019 settlement, denied a motion to value a secured claim, denied an objection to an allowed claim, and approved a Chapter 11 cramdown plan. We affirm.

## I. Background

AGE Refining, Inc. ("AGE"), owned and operated a petroleum refinery in San Antonio. AGE processed crude oil into jet fuel for sale to local military bases and certain airlines, financing the purchase of its oil primarily through credit facility arrangements with J.P. Morgan Chase Bank ("JP Morgan")[1] and Appellee Chase Capital ("Chase"). Chase's position was secured by liens in certain AGE assets pursuant to a security agreement (the "Chase Security Agreement") with first-priority liens in the AGE refinery (the "Refinery") and some related AGE real and personal property. JP Morgan held first-priority security interests in AGE's cash, inventory, and accounts (the "Working Capital Assets"), in which Chase also held a subordinate security interest. AGE had four significant unencumbered assets: (1) approximately 14.52 acres of vacant real property adjacent to the Refinery (the "Adjacent Real Property"); (2) a tank farm in Elmendorf, Texas (the "Elmendorf Tank Farm"); (3) interests in executory contracts and unexpired leases under a storage and service agreement with the Redfish Bay terminal in San Patricio County, Texas (the "Redfish Bay Assets"); and (4) proceeds from pending avoidance claims against former AGE officers and directors (the "Gonzales Litigation"). Although Chase

---

[1] In the lower court record, JP Morgan is sometimes referred to as "Chase Bank." We use "JP Morgan" to distinguish from Appellee Chase Capital.

## No. 14-50046

held no lien in the general proceeds from the Gonzales Litigation, it did assert a lien in one underlying component of the Gonzales Litigation: an AGE account receivable from one of the defendants in that case (the "ATI Receivables"), valued at about $1.7 million. Chase later agreed to release its lien in the ATI Receivables as part of AGE's settlement of the Gonzales Litigation on December 12, 2011.

AGE filed a voluntary petition commencing Chapter 11 proceedings on February 8, 2010. Chase properly filed a secured pre-petition claim against AGE of about $40.2 million; JP Morgan properly filed a secured pre-petition claim of about $35 million. Various unsecured creditors also filed claims, represented collectively by the Committee.

JP Morgan's pre-petition claim constituted unfunded letters of credit extended to AGE trade creditors to secure AGE crude supply purchases.[2] The bankruptcy court authorized post-petition payment of critical vendors from other estate assets, thereby paying trade creditors during administration without requiring funding of the letters of credit comprising JP Morgan's pre-petition claim. These unfunded pre-petition letters of credit were ultimately retired or otherwise paid, satisfying JP Morgan's pre-petition claim in full.

On March 3, 2010, the bankruptcy court entered an order permitting AGE to obtain "debtor-in-possession" ("DIP") financing through a new, post-petition credit facility arrangement with JP Morgan. The DIP Financing Facility was an agreement among AGE, JP Morgan, and Chase, and it also provided authority for AGE to use the cash collateral of JP Morgan as first-priority lienholder and Chase as second-priority under Bankruptcy Code

---

[2] An unfunded letter of credit is a line of credit that a lender has issued to a borrower, enabling the borrower to draw funds, but upon which the borrower has not drawn funds.

section 363.[3] JP Morgan renewed its first-priority liens in the Working Capital Assets and received new first-priority liens in AGE's unencumbered assets—the Adjacent Real Property, the Elmendorf Tank Farm, and the Redfish Bay Assets—in exchange for post-petition financing.

AGE stipulated to the validity and amount of Chase's and JP Morgan's secured pre-petition claims and, acting as debtor-in-possession, decided early in the case to sell substantially all its assets in a sale under section 363 or, alternatively, through a liquidating plan. The bankruptcy court approved the sale procedures on March 8, 2010, but AGE faced unexpected delays in restarting operations, adverse domestic economic conditions, mismanagement, and a massive explosion and fire at the Refinery on May 5, 2010 (the "Truck Rack Fire"). These difficulties forced delay in the sale process. The Truck Rack Fire gave rise to an insurance claim to which Chase's lien in the Refinery attached as to the casualty policy proceeds. In light of these difficulties and on the joint motion of Chase, JP Morgan, and the Committee, the bankruptcy court appointed Eric Moeller (the "Trustee") to serve as Chapter 11 Trustee for AGE, effective July 6, 2010.

A. The Sale to NuStar.

By April 2011, the Trustee had renewed sale efforts and chose NuStar Energy ("NuStar") as designated purchaser for the Refinery (including the Working Capital Assets), the Adjacent Real Property, and the Elmendorf Tank Farm. The sale to NuStar did not include the Redfish Bay Assets. The bankruptcy court approved the sale to NuStar for a base purchase price of $41

---

[3] 11 U.S.C. § 363. All section references herein are to title 11 of the United States Code (the "Bankruptcy Code").

million, $2.2 million for platinum on hand,[4] and a "net working capital adjustment." This Working Capital Adjustment was a post-closing finalization of the value of the Working Capital Assets. It appears from the record that because the relevant parties could only estimate the value of the Working Capital Assets at the close of the sale to NuStar, the ultimate purchase price could have been either greater or less than the $41 million base price. By its terms, the Refinery Sale Order directed that NuStar place about $8 million in escrow and transfer about $37 million to the Trustee at closing. Of that $37 million, after subtracting expenses, the Refinery Sale Order directed that the Trustee transfer $36 million to Chase, in partial payment of its pre-petition claim, and $118,915 to JP Morgan, in partial payment of the DIP Financing Facility balance. The sale to NuStar closed on April 19, 2011.

On April 28, 2011, pursuant to the Refinery Sale Order, the Trustee and NuStar jointly prepared an estimated valuation of the Working Capital Assets, permitting the release of about $5 million from escrow to the Trustee, leaving $3 million in escrow, subject to finalization of the Working Capital Adjustment.

Following the sale to NuStar and the subsequent release of part of the escrowed funds, the Trustee held $12,653,111 in cash. On May 6, 2011, the Trustee transferred $7 million to JP Morgan, reducing the outstanding balance of the DIP Financing Facility to about $5 million and leaving the Trustee with a cash balance of about $5.6 million. The partial payment to Chase had reduced the outstanding balance of Chase's pre-petition claim to about $4.2 million.

B. The Redfish Bay Sale.

Meanwhile, the Trustee sought permission to sell the Redfish Bay Assets

---

[4] Platinum is used as a catalyst in refining. It is unclear from the record whether the platinum on hand was covered in security agreements for the Working Capital Assets. Our holding does not depend on such coverage.

separately. On May 20, 2011, the bankruptcy court authorized the sale of the Redfish Bay Assets to TexStar MidStream Services for $6.5 million. The Redfish Bay Sale Order directed the Trustee upon closing to reduce or eliminate the remaining DIP Financing Facility balance from sale proceeds.[5] The Redfish Bay sale closed on May 20, 2011, and the Trustee as directed paid the DIP Financing Facility virtually in full, leaving the remainder of the sale proceeds to the AGE estate.[6]

C. The Working Capital Adjustment.

Three weeks later, on June 10, 2011, the Trustee and NuStar finalized the Working Capital Adjustment, agreeing to value the Working Capital Assets at about $4.8 million. The $3 million remaining in escrow was released to the Trustee and NuStar transferred an additional $2.8 million to the Trustee. All told, the Trustee received a final purchase price of about $48 million in the sale to NuStar: the $41 million base price (for the Refinery, the Adjacent Real Property, and the Elmendorf Tank Farm, collectively), plus $2.2 million (for the platinum on hand), plus $4.8 million (for the Working Capital

---

[5] The Redfish Bay Sale Order provided, in pertinent part, as follows:

[I]nterim partial payments of [JP Morgan's] claims may be made from the proceeds of the transaction contemporaneously with the [c]losing. The Trustee submits that the interim, partial payments of the [DIP Financing Facility] due [JP Morgan] are entirely appropriate because (i) such payments were a precondition to the consents of [JP Morgan] and [Chase] to the [Redfish Bay] Sale . . . (ii) the Trustee might not be able to adequately protect the liens of [JP Morgan] in the cash proceeds of its collateral, and (iii) it would make little economic sense for the Trustee to retain the proceeds in escrow and continue to incur the substantial ongoing interest accruals and "negative carry" with respect to the [DIP Financing Facility].

[6] NuStar had posted back-up letters of credit, along with the Trustee's segregation of cash collateral, to cover any outstanding letters of credit attributable to the DIP Financing Facility. Although JP Morgan was still owed certain accrued but unpaid letter of credit fees, those fees appear to have totaled less than $10,000.

No. 14-50046

Assets).[7]

The Trustee did not allocate the $41 million base price among the various underlying collateral (the Refinery, the Adjacent Real Property, and the Elmendorf Tank Farm). Although the parties stipulated to a fair market value of the Adjacent Real Property of about $1.9 million, the parties dispute what portion of the remaining $39.1 million represents proceeds from sale of the Refinery (encumbered by Chase's lien) versus the Elmendorf Tank Farm (unencumbered by Chase). The Committee argues on appeal that the Elmendorf Tank Farm represents between $1.3 million and $4 million of the base price and, therefore, that the proceeds from the sale of the Refinery total $35.4 to $38.1 million.[8]

D. Chase's Claim for Post-Petition Interest.

On August 2, 2011, Chase filed a post-petition claim for payment of principal, interest, and other charges pursuant to section 506(b).[9] Chase asserted it was oversecured[10] and entitled to post-petition interest pursuant

---

[7] NuStar initially paid $37,146,000.02 to the Trustee and placed $8,118,562.84 in escrow, totaling $45,264,562.86 before the Working Capital Adjustment. All escrowed funds were ultimately released to the Trustee, and NuStar paid an additional $2,783,083.63, for an adjusted total purchase price of $48,047,646.49.

[8] In the Committee's view, if we begin with the $41 million base price and subtract $1.9 million for the Adjacent Real Property and $1.3 to $4 million for the Elmendorf Tank Farm, we are left with $35.4 million to $38.1 million to allocate to the Refinery.

[9] 11 U.S.C. § 506(b) provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery . . . is greater than the amount of such claim, there shall be allowed to the holder . . . interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose.

[10] A creditor is "oversecured" where the value of its secured collateral exceeds the amount of its secured claim.

7

No. 14-50046

to the terms of the Chase Security Agreement,[11]  which provided for post-petition interest to accrue at the default rate.[12]  Applying that rate, Chase sought "up to $6 million" in post-petition interest. An oversecured creditor is entitled to post-petition interest on its claim only "to the extent that such interest, when added to the principal amount of the claim, [does] not exceed the value of the collateral."[13] Accordingly, Chase argued that the combined value of its liens in the proceeds from the sale to NuStar, the proceeds from the Working Capital Assets, the insurance proceeds from the Truck Rack Fire, and the ATI Receivables exceeded the amount of its pre-petition claim by up to $6 million. As an alternative remedy, Chase filed an administrative expense claim against the AGE estate seeking $14.7 million for failure to adequately protect Chase's liens in the event that the bankruptcy court found Chase undersecured.

On August 3, 2011, the Committee challenged Chase's oversecured status in a motion to value Chase's secured collateral under section 506. The Committee included a proposed order setting the value of Chase's collateral at $39 million and objected to Chase's claim for post-petition interest and its alternative diminution claim. Although the Trustee disputed the absolute extent to which the value of Chase's secured collateral exceeded the amount of its pre-petition claim, the Trustee did not dispute that the collateral value

---

[11] *See In re Laymon*, 958 F.2d 72, 75 (5th Cir. 1992) ("[W]hen an oversecured creditor's claim arises from a contract, the contract provides the rate of post-petition interest.").

[12] *See In re Southland Corp.*, 160 F.3d 1054, 1059–60 (5th Cir. 1998) (discussing post-petition interest at a default rate under section 506(b) and holding that "a default interest rate is generally allowed, unless 'the higher rate would produce an inequitable . . . result'" (alteration in original) (quoting *In re Laymon*, 958 F.2d at 75)). The Committee does not contest the equity of the default rate here, and therefore we do not address it.

[13] *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372 (1988); *see* 11 U.S.C. § 506(a)–(b). For instance, if Chase were oversecured by $4 million, it would be entitled to a post-petition claim of $4 million under section 506, even though the Chase Security Agreement provided for up to $6 million in post-petition interest.

exceeded the amount of the pre-petition claim as a relative matter, thus making Chase oversecured. The Trustee requested permission to pay the $40.2 million principal balance of Chase's pre-petition claim from cash on hand. The bankruptcy court granted permission and by its order preserved Chase's $6 million claim for post-petition interest but did not address the Motion to Value or the Claim Objection.

E.  <u>The Settlement Agreement.</u>

The Trustee and Chase subsequently negotiated a settlement of Chase's post-petition claim. Under the terms of the Settlement Agreement, the Trustee allowed Chase to retain the $40,212,048.63 payment made to Chase in satisfaction of its pre-petition claim and Chase agreed to waive additional claims, including its alternative $14.7 million administrative claim. In exchange, Chase would receive an allowed post-petition claim of $5 million, comprising an allowed secured post-petition claim of $3,615,000 and an allowed unsecured post-petition claim of $1,385,000. The Trustee further agreed to "[i]mmediately pay [Chase] the sum of $200,000.00 as a payment of a portion of [Chase's allowed secured post-petition claim under the Settlement Agreement]." The Trustee and Chase filed a joint motion to approve the Settlement Agreement under Federal Rule of Bankruptcy Procedure ("Rule") 9019(a) on September 13, 2011.

F.  <u>The Consolidated Hearings.</u>

The bankruptcy court held consolidated hearings on October 27 and 28, 2011 (the "Consolidated Hearings"), regarding the Settlement Agreement, the Motion to Value, and the Claim Objection. During the Consolidated Hearings, the Committee produced numerous exhibits, evidence of stipulations, and witness testimony in support of its position as to each of the consolidated matters. Counsel for the Committee cross-examined witnesses for the Trustee

and for Chase. On November 1, 2011, over the Committee's objections, the bankruptcy court issued an oral ruling approving the Settlement Agreement. In its oral ruling, the bankruptcy court considered the Settlement Agreement, the Motion to Value, and the Claim Objection "intertwined [such that] the resolution of one resolve[d] the others." Consistent with that view, in addition to approving the Settlement Agreement the bankruptcy court also denied the Motion to Value and the Claim Objection. The bankruptcy court memorialized its oral ruling in three separate orders—one pertaining to the Settlement Agreement, one to the Motion to Value, and one to the Claim Objection. The Committee appealed the bankruptcy court's approval of the Settlement Agreement, its denial of the Motion to Value, and its denial of the Claim Objection.

G. The Plan of Reorganization.

The Trustee filed an amended plan of reorganization on November 15, 2011 (the "Third Plan"), incorporating the terms of the Settlement Agreement and stating that the $200,000 initial payment due Chase had been paid. The Committee objected to the Third Plan and the Trustee called for a vote with a deadline of December 6, 2011. The class of claims comprising the Committee's unsecured claims voted to reject confirmation. The class comprising Chase's allowed secured claim, which the Third Plan characterized as impaired, cast the deciding vote in favor of confirmation.

Following receipt of the ballots, the Trustee filed a "final" amended plan of reorganization (the "Fourth Plan") on December 9, 2011, incorporating what the Trustee's attorney described to the bankruptcy court as "some inconsequential and beneficial changes" to the Third Plan. Those changes included a rewording of the section of the Third Plan pertaining to the $200,000 initial payment due Chase under the Settlement Agreement (changes

No. 14-50046

underlined):

> Under the terms of the [Settlement Agreement], [Chase's] Post-Petition Claim is Allowed and capped at $5,000,000.00 . . . [Chase] was <u>to be</u> paid $200,000.00 of that $5,000,000.00 following entry of the order approving the [Settlement Agreement] <u>and prior to confirmation of a plan. Notwithstanding the obligation to make such payment, the Trustee has not made such payment and will not make such payment prior to confirmation. Notwithstanding such modification of [Chase's] right to payment, [Chase] has voted in favor of the Plan</u> . . . .

The bankruptcy court conducted a hearing on the record regarding plan confirmation on December 9, 2011. The bankruptcy court found Chase's claim to be impaired under section 1129(a)(10)[14] and confirmed the cramdown-style Fourth Plan over the Committee's objection.[15] The Committee appealed the bankruptcy court's confirmation of the Plan.

H. <u>The Appeal.</u>

The district court consolidated the Committee's appeals regarding the Settlement Agreement, the Motion to Value, the Claim Objection, and the Plan. In a memorandum and judgment dated January 3, 2014, the district court affirmed the bankruptcy court on all fronts. Although the Committee ostensibly asserted eight separate arguments on appeal, the district court

---

[14] 11 U.S.C. § 1129(a)(10) ("The court shall confirm a plan only if . . . [in a case where] a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan . . . .").

[15] *See* 7 *Collier on Bankruptcy* ¶ 1129.03 (16th ed. 2015) ("The [Bankruptcy] Code anticipates that not all reorganizations will proceed with the assent of all participants. . . . [C]onfirmation may be desirable when one or more classes refuse to accept the plan. . . . To confirm such a plan, the proponent must thus proceed under the nonconsensual confirmation provisions of section 1129(b). . . . In the colorful argot of bankruptcy practice, when the requirements of section 1129(b) are met, confirmation can be 'crammed down' the throat of the dissenting class.").

11

No. 14-50046

distilled those arguments to two central issues. First, the district court concluded that the bankruptcy court acted within its discretion in determining that the Settlement Agreement was fair and equitable. And second, the district court concluded under *In re Village at Camp Bowie I, L.P.*,[16] that the Fourth Plan "provided for the requisite 'impairment' necessary to give Chase a vote" in a cramdown confirmation under section 1129(a)(10) and (b). The Committee appeals the district court's judgment.

## II. Standard of Review

"When a court of appeals reviews the decision of a district court, sitting as an appellate court, it applies the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court."[17] Acting as a "second review court," we "review[] the bankruptcy court's findings of fact under the clearly erroneous standard, and the bankruptcy court's conclusions of law *de novo*."[18]  Although we may "benefit from the district court's analysis of the issues presented, the amount of persuasive weight, if any, to be accorded the district court's conclusions is entirely subject to our discretion."[19] Our review is properly focused on the actions of the bankruptcy court.[20]

## III. Analysis

The Committee ostensibly designates eight issues on appeal. Of those

---

[16] 454 B.R. 702 (Bankr. N.D. Tex. 2011), *aff'd*, 710 F.3d 239 (5th Cir. 2013).

[17] *In re Crager*, 691 F.3d 671, 676 (5th Cir. 2012) (internal quotation marks omitted).

[18] *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 796 (5th Cir. 1997).

[19] *In re CPDC, Inc.*, 337 F.3d 436, 441 (5th Cir. 2003) (alterations and internal quotation marks omitted).

[20] *See In re Perry*, 345 F.3d 303, 309 (5th Cir. 2003) ("[W]e must determine whether the evidence supports the bankruptcy court's findings and set them aside only if we are left with 'the definite and firm conviction that a mistake has been committed.'" (quoting *In re Dennis*, 330 F.3d 696, 701 (5th Cir. 2003))).

12

eight issues, all but two challenge district court actions.[21] Acting as a "second review court" in a Chapter 11 bankruptcy case, we do not review the findings or conclusions of the district court—rather, we review the findings and conclusions of the bankruptcy court.[22] As an initial matter, we conclude that the issues the Committee designates challenging exclusively district court actions do not require our consideration, and we do not address those issues.

Further, although the Committee challenges Chase's eligibility to vote as an impaired creditor vis-à-vis the *district* court's decision affirming the bankruptcy court's approval of the Fourth Plan, nowhere in the Committee's voluminous briefing does it designate an issue or raise a substantial argument regarding an erroneous conclusion of law or finding of fact on the part of the *bankruptcy* court. We do not address this challenge, as the Committee has waived it.[23] Even assuming the Committee did not waive it, this challenge is

---

[21] The Committee designates the following issues:

[Issue One:] Both lower courts focused on settlement standards under [Rule 9019], ignoring issues and standards for determining: (i) value of the Chase secured claim; (ii) claims objections and/or, (iii) burden on Chase to establish the value of its collateral.;

[Issue Two:] The District Court erred when ignoring designated Plan issues . . . . ;

[Issue Three:] Error in determination that the Chase Settlement was fair and equitable and in the best interest of the estate and/or that the Bankruptcy Court abused its discretion when approving the Chase Settlement. . . . ;

[Issue Four:] The District Court was clearly in error when upholding determinations that Chase was oversecured. . . . ;

[Issue Five:] District Court was clearly erroneous in its findings . . . . ;

[Issue Six:] The District Court was clearly erroneous in review of confirmation issues focusing solely on Chase's status as an impaired creditor . . . . ;

[Issue Seven:] The District Court clearly erred by upholding determinations that the Plan was fair and equitable . . . . ;

[Issue Eight:] The District Court clearly erred by determining that Chase was impaired . . . .

Appellant's Brief at 3–7.

[22] *In re T-H New Orleans Ltd. P'ship*, 116 F.3d at 796.

[23] Federal Rule of Appellate Procedure 28(a)(5) requires an appellant's brief to include "a statement of the issues presented for review." *In re Tex. Mortg. Servs. Corp.*, 761 F.2d 1068, 1073 (5th Cir. 1985) ("Rule [28(a)(5)] has been construed as a mandate that the brief of the

arguably foreclosed by our decision in *In re Village at Camp Bowie I, L.P.*[24]

The Committee designates two issues implicating bankruptcy court actions reviewable here. We therefore consider: (1) whether the bankruptcy court abused its discretion in approving the Settlement Agreement; and (2) whether the bankruptcy court erred in denying the Motion to Value and the Claim Objection concurrent with its approval of the Settlement Agreement. We have discretion to consider the district court's analysis of these two issues, but we are not bound by its conclusions.[25]

## A.

We consider first the bankruptcy court's approval of the Settlement Agreement. The Committee claims in essence that Chase was not, in fact, oversecured, and that the bankruptcy court therefore should not have approved the Settlement Agreement. Our task is to review the bankruptcy court's decision for an abuse of discretion.[26]

A bankruptcy court may approve a compromise or settlement on motion by the trustee and after notice and a hearing pursuant to Rule 9019,[27] but it should do so "only when the settlement is fair and equitable and in the best

---

appellant contain a statement of the issues presented for review, and an argument portion which analyzes and supports those contentions." (citing 16 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Eugene Gressman, *Federal Practice & Procedure* § 3947, at 421 (1977))). Issues not raised or argued in the appellant's brief may be considered waived and thus will not be noticed or entertained. *Id.*; *see, e.g.*, *United States v. Whitfield*, 590 F.3d 325, 346 (5th Cir. 2009).

[24] 710 F.3d 239, 245 (5th Cir. 2013) ("[Section] 1129(a)(10) does not distinguish between discretionary and economically driven impairment. . . . [A]ny alteration of a creditor's rights, no matter how minor, constitutes impairment." (internal quotation marks omitted)).

[25] *In re CPDC, Inc.*, 337 F.3d 436, 441 (5th Cir. 2003).

[26] *In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.*, 592 F.3d 664, 668 (5th Cir. 2009).

[27] Fed. R. Bankr. P. 9019(a).

No. 14-50046

interest of the estate."[28] In determining whether a settlement is fair and equitable, we apply the three-part test set out in *Jackson Brewing* with a focus on comparing "the terms of the compromise with the likely rewards of litigation."[29] A bankruptcy court must evaluate: (1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise.[30] These "other" factors—the so-called *Foster Mortgage* factors—include: (i) "the best interests of the creditors, 'with proper deference to their reasonable views'"; and (ii) "'the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.'"[31]

1.

We are persuaded that the bankruptcy court undertook the requisite analysis in comparing the terms of the settlement with the likely rewards of litigation. The bankruptcy court made findings showing its consideration of the three-part *Jackson Brewing* test along with the *Foster Mortgage* factors. With regard to the Trustee's probability of success in litigation, the bankruptcy court found that "the success of the Committee's position would [ultimately] rest on an appeal," a prediction that stemmed from the bankruptcy court's "feel[ing] that Chase [was] oversecured." With regard to the complexity and likely duration of litigation, the bankruptcy court found that "[a]n appeal would be

---

[28] *See In re Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995).

[29] *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (internal quotation marks omitted).

[30] *Id.*

[31] *In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997) (quoting *In re Foster Mortg.*, 68 F.3d at 917–18).

costly, and would seriously delay the resolution of [the] case." And with regard to other factors bearing on the wisdom of the Settlement Agreement, the bankruptcy court found that the Settlement Agreement would "speed the full and fair closing of [the] estate, and a distribution to creditors;" that, "[c]onsidering the costs of litigation, the unsecured creditors [would] probably receive more in [the Settlement Agreement] than they would receive if the [Committee] prevailed on appeal;" that "[d]istribution to unsecured creditors [would] certainly be sooner than if this matter [were] litigated;" and that the Settlement Agreement "limit[ed] [Chase's] claim . . . allow[ed] for the payment of administrative expenses to pursue pending claims, allow[ed] for an orderly liquidation of the estate, and provide[d] for a potential recovery to the unsecured creditors."[32] The bankruptcy court also noted that, "[w]hen [the] case was [initially] filed, it appeared that there would be no recovery at all for the unsecured creditors."

2.

In evaluating a Rule 9019 settlement, a bankruptcy court need not "conduct a mini-trial to determine the probable outcome of any claims waived in the settlement."[33] Rather, the bankruptcy court must "apprise [itself] of the relevant facts and law so that [it] can make an informed and intelligent decision."[34] Given the record and structure of the Settlement Agreement, the

---

[32] Although the bankruptcy court did not expressly consider whether the Settlement Agreement was "truly the product of arms-length bargaining," a close look at the record indicates that neither fraud nor collusion is likely here and, in any event, the Committee does not raise the bankruptcy court's omission of that factor in its briefing.

[33] *In re Cajun Elec. Power Coop.*, 119 F.3d at 356.

[34] *Id.*; *see In re Am. Reserve Corp.*, 841 F.2d 159, 163 (7th Cir. 1987) ("Since a bankruptcy judge will normally be familiar with the governing law and the factual issues surrounding a settlement, setting out his reasons for approving the settlement should not be unduly burdensome. A bankruptcy judge need not hold a mini-trial or write an extensive opinion every time he approves or disapproves a settlement. The judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent

bankruptcy court implicitly made findings regarding the value of Chase's various secured collateral relative to the amount of Chase's pre- and post-petition claims. We are persuaded from the record that the bankruptcy court adequately apprised itself to make an informed and intelligent decision in approving the Settlement Agreement and did so.

The parties dispute the value of Chase's various secured collateral. The record reflects that the bankruptcy court had before it estimated values of the Refinery ($35.4 to $38.1 million), the Working Capital Assets ($4.8 million), the insurance proceeds from the Truck Rack Fire ($0 to $6.6 million), and the ATI Receivables ($1.7 million). The Trustee urges that these values support the bankruptcy court's conclusion that, if the matter were to proceed to litigation, Chase could have ultimately demonstrated by a preponderance of the evidence a combined secured collateral value of at least $46.2 million, representing its $40.2 million pre-petition claim plus its $6 million post-petition interest claim.[35]

The Committee asserts that at the time of the Consolidated Hearings the Working Capital Assets were subject to JP Morgan's first-priority lien such that Chase's second-priority lien should have been assigned no value. The Committee's argument must rely on an assumption that the Trustee erred in not paying down the DIP Financing Facility balance prior to the Redfish Bay sale. Recall that JP Morgan held first-priority liens in the Working Capital Assets and the Redfish Bay Assets pursuant to the DIP Financing Facility,

decision, and set out the reasons for his decision. The judge may make either written or oral findings; form is not important, so long as the findings show the reviewing court that the judge properly exercised his discretion.").

[35] *See In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 798 (5th Cir. 1997) ("The creditor . . . bears the ultimate burden to prove by a preponderance of evidence its entitlement to postpetition interest . . . .").

while Chase held a subordinate lien in the Working Capital Assets but no lien in the Redfish Bay Assets. In the Committee's view, had the Trustee used the proceeds from the Working Capital Assets to pay down the DIP Financing Facility balance earlier, JP Morgan's lien in the Redfish Bay Assets would have been effectively extinguished, or at least minimized, and a greater share of the proceeds from the Redfish Bay sale—now unencumbered—would have been diverted into AGE's general coffers for the unsecured creditors to share. In essence, the Committee challenges the Trustee's decision to instead pay JP Morgan out of the proceeds from the Redfish Bay sale, which effectively extinguished JP Morgan's lien in the Working Capital Assets and left the proceeds thereof to Chase, to the exclusion of the unsecured creditors.

The Committee's argument fails to persuade for two reasons. First, as the bankruptcy court explained, the Trustee had discretion to retain certain funds needed "to keep the estate alive, to pay ongoing expenses, administrative claims, and possible refunds which might have been due in connection with the sale of the [Refinery]." The Trustee was under no obligation to pay down the DIP Financing Facility prior to the Redfish Bay sale. Second, the Committee's reasoning is confounded by the timing of events reflected in the record. The Trustee paid the DIP Financing Facility in full pursuant to the Redfish Bay Sale Order on May 20, 2011, effectively extinguishing JP Morgan's first-priority lien in the Working Capital Assets and elevating Chase's lien to first priority. The Working Capital Adjustment, which caused the release of proceeds from the Working Capital Assets to the Trustee, would not occur until three weeks later, on June 10, 2011. Thus, as of the Redfish Bay sale, the Trustee could not have paid down the balance of the DIP Financing Facility using the proceeds from the Working Capital Assets even if—in his discretion—he wished to do so. The timing of events did not allow for the

No. 14-50046

Trustee to use the proceeds from the Working Capital Assets to pay down the DIP Financing Facility balance prior to the Redfish Bay sale. The bankruptcy court therefore could reasonably have assigned the entire $4.8 million estimated value of the Working Capital Assets to Chase as secured collateral value in assessing the Trustee's probability of success in litigation.

The Committee further asserts that, at the time of the Settlement Agreement hearing, the bankruptcy court should have assigned values to the Truck Rack Fire claim and the ATI Receivables according to what those claims *ultimately* garnered. The Truck Rack Fire claim settled on November 30, 2011, for $2.35 million and Chase agreed to release its lien in the ATI Receivables in full as part of AGE's settlement of the Gonzales Litigation on December 12, 2011. The Committee's assertion misconstrues the focus of our inquiry. We consider the bankruptcy court's approval of the Settlement Agreement based on the record before it *at the time it made its determination*, which occurred on November 1, 2011. At that time, the bankruptcy court had before it an estimated value for the Truck Rack Fire claim of between $0 and $6.6 million; and for the ATI Receivables, an estimated value of $1.7 million.

In short, the record provides support for the Trustee's conclusion that the estate faced some probability of failure in litigating Chase's post-petition claim such that the Settlement Agreement posed a fair and equitable, and favorable, alternative. We hold that the bankruptcy court did not abuse its discretion in approving the Settlement Agreement—a compromise the Trustee made in discharge of his fiduciary duty.

## B.

We turn next to the Committee's contention that the bankruptcy court was required under sections 502(b) and 506(a) to determine the value of Chase's post-petition claim through continued litigation before denying the

19

No. 14-50046

Claim Objection and the Motion to Value. This question arises in a narrow context. The bankruptcy court held hearings on the Settlement Agreement, the Motion to Value, and the Claim Objection. The Committee adduced evidence and testimony regarding each matter. It developed the record fully.[36] After the Consolidated Hearings, the bankruptcy court ruled on each matter separately. The Committee does not now seek a right to adduce evidence to be fully heard and receive a ruling on its objections. It rather seeks detailed findings pertaining to each individual ruling. As these arguments raise questions of statutory construction, we review *de novo*.[37]

1.

The Committee's first argument focuses on whether the bankruptcy court had an obligation to "determine" the allowed amount of Chase's claim under section 502(b) in response to the Claim Objection. Chase filed a claim for post-petition interest under section 506(b), which provides, "[t]o the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim[] interest on such claim."[38] Section 502(a), in turn, deems a properly filed claim allowed unless a party in interest objects.[39] The Committee objected. Section 502(b) provides that "if . . . objection to a claim is made, the court, after notice and a hearing, *shall determine the amount of such claim* in

---

[36] The Committee acknowledged at oral argument that nothing remains to be said. The transcripts of the Consolidated Hearings comprise more than seven hundred pages of witness testimony, most of which pertain to the essential question at issue on appeal—whether Chase was oversecured.

[37] *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 244 (5th Cir. 2013) (citing *Matthews v. Remington Arms Co., Inc.*, 641 F.3d 635, 641 (5th Cir. 2011)).

[38] 11 U.S.C. § 506(b).

[39] *Id.* § 502(a).

lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount."[40]

The bankruptcy court denied the Committee's objection and approved the Settlement Agreement without making a section 502(b) determination. The Committee argues that in doing so the bankruptcy court defied the statute's plain command. We agree that the bankruptcy court erred. Under section 502(b), the Committee had a right to have the bankruptcy court "determine the amount of" Chase's allowed claim before it approved the Settlement Agreement. In this particular case, however, the bankruptcy court *did* provide the Committee, as an objecting party in interest, with notice and a hearing regarding its objection, allowing it to develop the record fully. The bankruptcy court then explicitly concluded that the Settlement Agreement was "in the best interest of the estate."[41] It is bare that the bankruptcy court could not have simultaneously approved the Settlement Agreement and granted the substantive relief the Committee sought. Implicit in the bankruptcy court's approval of the Settlement Agreement is a rejection of the Committee's position—a determination that, while not compliant with the statute, persuades us that the error complained of was harmless. Having carefully reviewed the record, in this case—albeit not a template for future like cases—we need not remand.[42]

---

[40] *Id.* § 502(b) (emphasis added). Section 502(b) provides for several exceptions, none of which apply here. *See id.* § 502(b)(1)–(9).

[41] *See In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (internal quotation marks omitted).

[42] Fed. R. Bankr. P. 9005 (providing that the harmless-error rule, Federal Rule of Civil Procedure 61, "applies in cases under the Code"); *see* Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error . . . is ground for . . . vacating, modifying, or otherwise disturbing a judgment order. . . . [T]he court must disregard all errors and defects that do not affect any party's substantial rights.").

Because we hold that the error was harmless, we need not consider the Committee's subsidiary argument under Rule 7052 that the bankruptcy court's oral ruling on the Claim

No. 14-50046

2.

The Committee's second argument, by contrast, focuses on whether the bankruptcy court had an obligation to "determine" the value of Chase's secured collateral under section 506(a) in response to the Motion to Value, which was filed pursuant to Rule 3012. As Chase's post-petition claim necessarily depends on Chase being oversecured, it implicates section 506(a), which provides that a secured creditor's allowed claim is secured "to the extent of the value of such creditor's interest . . . in such property . . . and is [otherwise] an unsecured claim."[43] That section goes on to explain that "[s]uch value *shall be determined* in light of the purpose of the valuation . . . and in conjunction with any hearing on . . . a plan affecting such creditor's interest."[44] Alongside section 506(a), Rule 3012 provides that "[t]he court *may determine the value of a* [*secured*] *claim . . . on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct."[45]

The Committee urges that the bankruptcy court was required to "determine" the absolute value of Chase's secured collateral under section 506(a) in response to the Motion to Value. We disagree. Whereas section 502(b) pertains to a determination of the allowed amount of any claim, section 506(a) applies only in situations involving the valuation of a secured creditor's collateral. And in contrast to section 502(b), where Congress used mandatory language—"shall determine"—to require an action on the part of the bankruptcy court, section 506(a) contains no such language. Section 506(a)

---

Objection was insufficient to allow for adequate appellate review. *See* Fed. R. Bankr. P. 7052 (providing that Federal Rule of Civil Procedure 52 "applies in adversary proceedings"); Fed. R. Civ. P. 52 ("[T]he court must find the facts specially and state its conclusions of law separately.").

[43] 11 U.S.C. § 506(a)(1).

[44] *Id.* (emphasis added).

[45] Fed. R. Bankr. P. 3012 (emphasis added).

provides only that, *if* a bankruptcy court undertakes to determine the value of secured collateral, "[s]uch value *shall be determined* in light of the purpose of the valuation."[46] But nowhere do we read the language of section 506 to require a "determination." A plain reading of section 506(a) in context makes clear that "determine" under that provision is permissive rather than mandatory.[47]

Section 506(b) entitles an oversecured creditor to post-petition interest to the extent of that creditor's "security cushion."[48] Rule 3012, "read together with section 506,"[49] anticipates that some secured creditors' claims for post-petition interest will draw requests by other parties for the bankruptcy court to "determine" the value of the underlying collateral. The purpose of these requests, of course, is to establish the extent of the creditor's security cushion and corresponding entitlement to post-petition interest. To that end, Rule 3012 provides that "[t]he court *may determine* the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct."[50] We read the permissive language of Rule 3012—"may determine"—to afford a bankruptcy court discretion "to

---

[46] 11 U.S.C. § 506(a)(1) (emphasis added).

[47] Lower courts agree. *See In re Hudson*, 260 B.R. 421, 432–33 (Bankr. W.D. Mich. 2001); *In re Envirocon Int'l Corp.*, 218 B.R. 978, 980 (M.D. Fla. 1998) ("[T]he permissive aspect of Rule 3012 lies . . . in the court's discretion to deny the motion." (citing *In re Linkous*, 141 B.R. 890, 894 (W.D. Va. 1992))); *In re Herrick*, Nos. 96-82441, 96-8250, 1997 WL 33475213, at \*4 (Bankr. C.D. Ill. May 12, 1997) ("Rule 3012 is permissive, not mandatory."); *In re Wolf*, 162 B.R. 98, 106–07 (Bankr. D.N.J. 1993) (same); *In re Washington Mfg. Co.*, 128 B.R. 198, 204 (Bankr. M.D. Tenn. 1991) (same).

[48] *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) ("Recovery of postpetition interest is unqualified."); *see United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372–73 (1988). The Supreme Court has referred to the amount by which the value of secured collateral exceeds a secured creditor's claim as that creditor's "security cushion." *Id.*

[49] 9 *Collier on Bankruptcy* ¶ 3012.01 (16th ed. 2015).

[50] Fed. R. Bankr. P. 3012 (emphasis added).

decline to make a ruling on value if [it] determines [such] ruling to be unnecessary."[51] We see no conflict between Rule 3012's permissive language and Section 506(a)'s provision that, where a bankruptcy court considers collateral valuation necessary, value must "be determined in light of the purpose of the valuation."

We affirmed above the Trustee's conclusion that the estate's best interests were better served by the Settlement Agreement than by continued litigation to determine the absolute value of Chase's secured collateral. We also held that, for purposes of section 502(b), although the bankruptcy court did not adequately determine the amount of Chase's allowed claim, its error was harmless. We hold now that the bankruptcy court did not abuse the discretion afforded it by Rule 3012 in declining the Committee's request to undertake a "more precise determination of value."[52] The bankruptcy court did not err in denying the Motion to Value simultaneously with its approval of the Settlement Agreement.

## IV.

We AFFIRM the district court's consolidated judgment affirming the bankruptcy court's orders approving the Settlement Agreement, denying the Claim Objection, and denying the Motion to Value.

---

[51] *See* 9 *Collier on Bankruptcy* ¶ 3012.01 (16th ed. 2015).
[52] *See id.*

No. 14-50046

OWEN, Circuit Judge, dissenting:

I agree with most of the panel's majority opinion. However, I respectfully submit that the bankruptcy court's error in failing to determine whether Chase Capital Corp. ("Chase") was in fact oversecured was not harmless. The Official Committee of Unsecured Creditors (the "Committee") contends that Chase was in fact undersecured and therefore that Chase will be overpaid under the terms of the Settlement Agreement by more than $5,000,000. The Committee further contends that any costs of future litigation to resolve whether Chase was oversecured would be substantially less than $5,000,000. There is a reasonable probability that the costs of further litigation would not approach $5,000,000. I therefore cannot say that the bankruptcy court's error was harmless or conclude that approval of the Settlement Agreement was fair and equitable or in the best interests of the estate.

Chase contends that if the Settlement Agreement is not approved, Chase will re-assert a $14.7 million claim against the Trustee, arguing that there was a diminution of the value of Chase's collateral. However, the Committee asserts that the value of Chase's collateral increased substantially (by approximately $25,000,000) during the pendency of the bankruptcy proceedings and that Chase's diminution claim should have been denied by the bankruptcy court or considered as having no value in assessing the Settlement Agreement. There appears to be evidence in the record supporting the Committee's position that Chase's collateral did not decline in value, and Chase does not contend otherwise in this appeal. Chase contends only that the Committee waived its argument regarding the diminution claim.

No. 14-50046

Because the bankruptcy court erred in failing to determine if Chase was oversecured under 11 U.S.C. § 502(b), and there are material issues of fact, I would remand this case to the bankruptcy court for findings.

The bankruptcy court held a two-day hearing and admitted numerous exhibits on the issue of the value of Chase's collateral, and without discussing any specific testimony or evidence in particular, it stated only that it "fe[lt]" as though Chase was oversecured. The Fifth Circuit has remanded for factual determinations when the lower court's factual findings are not "explicit enough to enable us to review them."[1]

In *In re Missionary Baptist Foundation of America*, the bankruptcy trustee and a creditor disagreed on the amount the creditor was secured in the estate's capital at different points in time.[2] The bankruptcy court did not make specific findings of fact; it stated only that that "the evidence does not support the trustee's position."[3] The Fifth Circuit was "left with no basis for deciding whether the bankruptcy court's 'findings' on this issue were clearly erroneous or not; indeed, we have no basis for meaningful review at all."[4] The court explained that "the proper solution is to remand the case for a factual determination" of the issue.[5]

In the present case, the bankruptcy court has provided an inadequate explanation for its determinations, and no meaningful review can occur on appeal. The bankruptcy court did not discuss *any* evidence or testimony

---

[1] *Ratliff v. Governor's Highway Safety Program*, 791 F.2d 394, 400 (5th Cir. 1986).

[2] *Wilson v. First Nat'l Bank, Lubbock, Tex. (In re Missionary Baptist Found. of Am., Inc.)*, 796 F.2d 752, 759-60 (5th Cir. 1986).

[3] *Id.* at 760.

[4] *Id.* at 761.

[5] *Id.*

supporting its "feel[ing]" of the value of Chase's collateral.  Nor did the bankruptcy court discuss evidence in support of its conclusion that "[c]onsidering the costs of litigation, the unsecured creditors will probably receive more in this settlement than they would receive if the committee prevailed upon appeal."

Remanding for a factual determination on Chase's secured status does not likely carry the risk of harm to third parties not party to this litigation that might otherwise accompany further litigation after a reorganization plan has been substantially consummated.  As this court explained regarding this particular bankruptcy litigation: "The only change in the estate distribution that the Committee seeks is a smaller distribution to Chase and a larger distribution to the Committee.  In this liquidating plan scenario, under the particular facts of this case, 'overturning the Plan' functionally would mean no more than re-allocation of money from Chase to other parties in interest."[6]

For these reasons, I would reverse and remand this proceeding to the bankruptcy court.

---

[6] *Official Comm. of Unsecured Creditors v. Moeller (In re AGE Refining, Inc.),* 537 F. App'x 393, 398 (5th Cir. 2013).